[Cite as *State v. Jackson-Williams*, 2020-Ohio-1118.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,            :

                           Nos. 108516 and 108611

    v.                             :

ROBERT A. JACKSON-WILLIAMS,             :

    Defendant-Appellant.           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
               AND REMANDED
**RELEASED AND JOURNALIZED:** March 26, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-18-629562-A and CR-18-634572-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Anthony M. Stevenson, Assistant Prosecuting Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

EILEEN T. GALLAGHER, A.J.:

{¶ 1} In this consolidated appeal, defendant-appellant, Robert Jackson-Williams, appeals his convictions and sentence. He claims the following errors:

1. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient

evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

2. Appellant's convictions are against the manifest weight of the evidence.

3. Appellant was deprived of a fair trial and due process by the admission of other acts evidence and irrelevant evidence.

4. Appellant's sentence is contrary to law because the record does not support the imposition of consecutive sentences.

{¶ 2} We find some merit to the appeal, affirm in part and reverse in part.

## I. Facts and Procedural History

{¶ 3} In Cuyahoga C.P. No. CR-18-629562-A, Jackson-Williams was charged with one count of domestic violence and two counts of endangering children. The domestic violence charge included a furthermore clause alleging that Jackson-Williams had previously pleaded guilty to, or been convicted of, two prior charges of domestic violence. These charges arose from an incident that occurred on May 18, 2018, in an Applebee's parking lot.

{¶ 4} Five months later, Jackson-Williams was indicted in Cuyahoga C.P. No. CR-18-634572-A, with one count of violating a protection order and one count of menacing by stalking. The menacing by stalking charge included a furthermore clause alleging that Jackson-Williams trespassed on the land or premises where the victim lives, is employed, or attends school. The violating a protection order alleged in Count 2 of the indictment was subsequently dismissed. The charges in this case precipitated from a series of actions that culminated in an incident that occurred on November 11, 2018, at L.J.W.'s apartment in Parma Heights.

{¶ 5} L.J.W. testified at a bench trial that she was married to Jackson-Williams and that they had two children together. They had previously been divorced and remarried but were separated at the time of the events giving rise to these consolidated cases. L.J.W. testified that the domestic relations court awarded her custody of the children in the divorce decree because Jackson-Williams failed to complete parenting classes. (Tr. 87.) Although L.J.W. and Jackson-Williams remarried, they believed the divorce decree granting L.J.W. sole custody of the children remained in effect.

{¶ 6} On May 18, 2018, L.J.W. picked Jackson-Williams up after work and they went, together, to pick up their six-year-old daughter, T.J.W., from school and their five-year-old son, M.J.W., from daycare. Thereafter, they went to an Applebee's restaurant, where L.J.W. believed Jackson-Williams would talk to T.J.W. about reports of her misbehavior at school.

{¶ 7} Jackson-Williams never broached the subject of T.J.W.'s misbehavior, and there was tension between L.J.W. and Jackson-Williams when they exited Applebee's. Jackson-Williams had brought a bag of clothes intending to spend the night with L.J.W. and the children. L.J.W. had no intention of spending the night with Jackson-Williams and told Jackson-Williams to remove his bag from her car so that she and the children could leave. Jackson-Williams refused to remove his bag and got into the passenger seat of the car. L.J.W. repeatedly asked Jackson-Williams to remove his bag and he continually refused.

**{¶ 8}** L.J.W. took the bag and placed it at the rear of the vehicle, hoping this would force L.J.W. to exit the car to retrieve the bag. According to L.J.W., Jackson-Williams exited the car, approached L.J.W. and angrily told her not to touch his "fucking stuff." (Tr. 44.) L.J.W. tried to close the car door, but Jackson-Williams swung it open and told L.J.W.: "I'm not going any fucking where." (Tr. 45.) This interaction continued for several minutes before Jackson-Williams started pushing L.J.W. into the car and threatened that he would "dog walk her" if she did not "get out of his fucking face." (Tr. 45-46.) L.J.W. testified that "dog walking" meant that he would choke her and drag her across the ground. (Tr. 46.)

**{¶ 9}** L.J.W. was standing next to the car when Jackson-Williams grabbed L.J.W.'s hand and twisted her arm around her back for several minutes while telling her to "stay out of my fucking face." (Tr. 47.) L.J.W. asked a group of women who were standing on the sidewalk to "[p]lease call 911." (Tr. 47.) Thereafter, Jackson-Williams released her arm and got back into the car. The couple's children, who were seated in the car, witnessed the struggle. (Tr. 46.)

**{¶ 10}** Jackson-Williams asked L.J.W., "Why can't we be a family? How come I can't leave with you guys?" (Tr. 48.) L.J.W. replied, "We don't want anything to do with you." (Tr. 48.) Jackson-Williams grabbed L.J.W.'s other hand and squeezed it tight. L.J.W. screamed and asked a couple who was walking into Applebee's to call 911. (Tr. 49.)

**{¶ 11}** L.J.W. testified that as a result of Jackson-Williams's actions, both her hands were sprained, her left hand was swollen, and she sustained cuts in

between her fingers. (Tr. 51.) L.J.W. authenticated photographs of her hands showing bruises and cuts between her fingers. L.J.W. testified that she went to the First District of the Cleveland Police Department the following day to report the incident, but was told to come back the next day. (Tr. 54-55.) She returned the next day and was told to go to another district. L.J.W. ultimately made a written report of the Applebee's incident at the Second District. (Tr. 55.) A detective from the domestic violence unit of the Cleveland Police Department conducted a follow-up investigation, and L.J.W. sought medical treatment for her hands at Metro Express Care three days after the incident.

{¶ 12} According to L.J.W., Jackson-Williams contacted her "daily" in the months following the May 18, 2018 incident even though she told him not to contact her. (Tr. 72, 75.) L.J.W. testified: "If he was not calling my cell phone, he was calling my desk phone at my job. He also just showed up to my employment several times unannounced, uninvited." (Tr. 75.) Jackson-Williams called from his personal phone, his work phone, and from his friends' phones. (Tr. 72.) He also sent L.J.W. emails at both her personal and work email addresses. L.J.W. testified that she was the victim of Jackson-Williams's two prior domestic violence convictions. She also testified that she filed for a civil-protection order in Cleveland in June 2018, and had previously filed for a protection order in Euclid in March 2018. (Tr. 83-84.) The protection orders were issued ex parte, and there is no evidence that Jackson-Williams had any notice of them.

{¶ 13} L.J.W. testified that Jackson-Williams came to her workplace three times in October 2018. (Tr. 75.) During one instance, he apologized for the May 18, 2018 incident and asked what it would take to get back together. (Tr. 77.) Jackson-Williams told L.J.W. that he had been to her apartment building the previous Saturday and told her exactly where her car was parked. (Tr. 77.) He also told her that he befriended her friends and family on Facebook so he could monitor her activities. (Tr. 77.)

{¶ 14} On November 11, 2018, Jackson-Williams came to L.J.W.'s apartment in Parma Heights at 10:50 p.m. L.J.W. testified that she never received visitors at that time of night, and Jackson-Williams had repeatedly called her that day. At first, he called every five minutes. Later, he called every 30 minutes. Jackson-Williams rang the buzzer of L.J.W.'s apartment six or seven times, but L.J.W. did not answer. L.J.W. knew it was Jackson-Williams and called 911. Meanwhile, Jackson-Williams walked around to the rear of the building and called out to L.J.W. While L.J.W. was on the phone with the 911 dispatcher, she heard the sound of rocks being thrown at her windows. L.J.W. admitted that she did not see Jackson-Williams throw the rocks because she "was shaking too much to even try to look out the window" and she did not want him to see her. (Tr. 61.) She testified that she was "nervous" and "scared" because Jackson-Williams had repeatedly called her that day. (Tr. 60.)

{¶ 15} Eric Taylor, a patrolman with the Parma Heights Police Department, testified that he responded to L.J.W.'s apartment in response to her 911 call and

arrested Jackson-Williams. Anthony Donofrio, another officer who responded to the 911 call, testified that he spoke with L.J.W. He described her as "flustered" and that she did "not have the ability to have a normal, calm conversation." (Tr. 119.) L.J.W. told Officer Donofrio that Jackson-Williams had repeatedly called her that day and voluntarily showed him her phone so he could see the call history and listen to his voicemails.

{¶ 16} Jackson-Williams testified in his own defense and admitted that he had two prior domestic-violence convictions. According to Jackson-Williams, L.J.W. was angry with a server at Applebee's and he intervened in order to avoid making a scene. (Tr. 158-159.) As a result, L.J.W. directed her anger at Jackson-Williams and told him to get his bag out of her car. Jackson-Williams testified that L.J.W. grabbed his collar and yanked him so he grabbed her hand to defend himself. (Tr. 162.) According to Jackson-Williams, he and L.J.W. fought over his bag and L.J.W. asked people passing by to call 911. (Tr. 164.) Jackson-Williams stated that he, himself, called 911 to report the incident and to protect himself because he had a pending domestic violence case in Euclid, Ohio. The 911 dispatcher told Jackson-Williams to come to the station to report the injuries, but he declined to do so because there was an outstanding warrant for his arrest. He testified that he had scratches and was bleeding as a result of the incident.

{¶ 17} Jackson-Williams testified that he never intended to cause injury to L.J.W., but he wanted to see his children. He admitted that he grabbed L.J.W., but

claimed he was only acting in self-defense. He also testified that he filed for divorce in 2017, and presented a certified copy of the docket from his divorce case.

{¶ 18} With respect to the November 11, 2018 incident, Jackson-Williams testified that he never entered L.J.W.'s apartment; he only rang the buzzer. (Tr. 175.) The police informed him that he was in violation of a temporary restraining order, but Jackson-Williams was unaware that there was a restraining order preventing him from contacting L.J.W.

{¶ 19} Jackson-Williams admitted that L.J.W. told him to leave her alone after the Applebee's incident, but he continued to contact her because he wanted to see his children. (Tr. 187-188.) He also admitted that he spoke with L.J.W. outside of her place of employment in October 2018, to discuss their children and to apologize for having three children with another woman during their marriage. (Tr. 177.) Jackson-Williams has a total of nine children, including the two with L.J.W.

{¶ 20} The trial court found Jackson-Williams guilty of one count of domestic violence, two counts of child endangering, and one count of menacing by stalking. The court sentenced him to 30 months in prison on the domestic violence conviction and 180 days in prison on each of the child endangering convictions, to be served concurrently. The court sentenced Jackson-Williams to 12 months on the menacing by stalking conviction to be served consecutive to his 30-month sentence on the domestic violence charge, for an aggregate 42-month sentence. Jackson-Williams now appeals his convictions and sentence.

## II. Law and Analysis

### A. Sufficiency of the Evidence

**{¶ 21}** In the first assignment of error, Jackson-Williams argues the trial court erred in denying his Crim.R. 29 motion for acquittal where there was insufficient evidence to sustain his convictions.

**{¶ 22}** "[T]he test for sufficiency requires a determination of whether the prosecution met its burden of production at trial." *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 23}** Jackson-Williams was convicted of third-degree felony domestic violence in violation of R.C. 2919.25(A), which states that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(D)(4) further provides, in relevant part:

> If the offender previously has pleaded guilty to or been convicted of two or more offenses of domestic violence * * * at the time of the violations or offenses, a violation of division (A) or (B) of this section is a felony of the third degree * * *.

Therefore, in order to convict Jackson-Williams of third-degree-felony domestic violence, the state had to prove that he knowingly caused or attempted to cause

physical harm to a family or household member and that he had previously been convicted of two or more counts of domestic violence.

{¶ 24} It is undisputed that L.J.W. is a "family or household member" because she was Jackson-Williams's wife. R.C. 2929.25(F)(1)(a)(i) defines "family or household member" in part as "a spouse." Jackson-Williams argues there was insufficient evidence that he committed domestic violence because there was no evidence that he knowingly caused, or attempted to cause, physical harm to L.J.W. since she did not immediately seek medical treatment or report the incident to the police.

{¶ 25} However, R.C. 2901.01(A)(3) defines "physical harm to persons" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." L.J.W. testified that Jackson-Williams squeezed her hand and twisted her arm behind her back for several minutes while she screamed for help. L.J.W. further testified that she sustained bruises and scratches on her hands as a result of Jackson-Williams's conduct, and she authenticated pictures of her injuries that were admitted into the record as evidence. The fact that Jackson-Williams continued to twist her arm and squeeze her hand while she called for help demonstrates an intent to cause her physical harm, regardless of whether she subsequently sought medical treatment for injuries. R.C. 2919.25 does not require the state to prove that the victim sustained any actual injury, "since a defendant can be convicted of domestic violence for merely attempting to cause physical harm." *State v. Nielsen*, 66 Ohio App.3d 609, 612, 585 N.E.2d 906 (6th

Dist.1990); *State v. Blonski*, 125 Ohio App.3d 103, 114, 707 N.E.2d 1168 (9th Dist.1997) ("A defendant may be found guilty of domestic violence even if the victim sustains only minor injuries, or sustains no injury at all.").

{¶ 26} Jackson-Williams further argues there was insufficient evidence to sustain a third-degree-felony count of domestic violence because one of the prior convictions used to enhance the current domestic violence charge was not a cognizable offense because, in that case, Jackson-Williams was convicted of "attempted domestic violence."

{¶ 27} "When a prior conviction elevates a misdemeanor to a felony, 'the prior conviction is an essential element of the crime, and [it] must be proved by the state.'" *State v. Tate*, 138 Ohio St.3d 139, 2014-Ohio-44, 4 N.E.3d 1016, ¶ 17, quoting *State v. Allen*, 29 Ohio St.3d 53, 54, 506 N.E.2d 199 (1987). This court has held that a prior attempted domestic violence conviction is sufficient evidence of the prior conviction element necessary to enhance a domestic violence charge to a third-degree felony. *See State v. Stover*, 8th Dist. Cuyahoga No. 104388, 2017-Ohio-291, ¶ 24. Therefore, because the state introduced evidence that Jackson-Williams had previously been convicted of one count of domestic violence and one count of attempted domestic violence, the state proved all the elements necessary for a third-degree felony offense of domestic violence.

{¶ 28} Jackson-Williams nevertheless argues there was insufficient evidence to support his two child-endangering convictions because there is no evidence that his actions posed any risk to the health or safety of his children. He

asserts the children were never endangered because they were secured in their car seats during his struggle with L.J.W.

{¶ 29} Jackson-Williams was convicted of two counts of child endangering, in violation of R.C. 2919.22(A), which states, in relevant part:

> No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

{¶ 30} It is undisputed that Jackson-Williams assaulted the children's mother in their presence. However, the children were secured with seat belts in the car while Jackson-Williams assaulted their mother outside of the car. Therefore, there was never any risk to the physical health or safety of the children as a result of Jackson-Williams's conduct.

{¶ 31} Nevertheless, the state asserts that child endangering is not limited to physical safety, and that it includes a child's mental and emotional safety. The state cites *Hoyt v. Heindell*, 191 Ohio App.3d 373, 946 N.E.2d 258 (11th Dist.2010) in support of this argument. In *Hoyt*, a domestic relations court granted a father's petition for domestic-violence civil protections orders based on allegations that the mother's husband regularly consumed beer while driving a motor vehicle in which the father's child was a passenger. It was also alleged that the child's mother permitted this behavior. At the hearing on the petitions, the child testified that his mother's husband frequently drank beer while driving and that his mother sometimes drank beer in the car as well. The Eleventh District affirmed the

issuance of the domestic-violence civil protection orders on grounds that the mother and her husband created a substantial risk to the health and safety of the child by regularly drinking beer while operating a motor vehicle. *Id.* at ¶ 53. The court also noted that the mother and her husband not only placed the child "in direct harm by their actions, they were also placing him in indirect harm, by implicitly telling a teenager that it is acceptable for someone to consume beer while driving motor vehicle." *Id.* at ¶ 56.

{¶ 32} Applying the court's reasoning in *Hoyt*, the state argues that by committing domestic violence in his children's presence, Jackson-Williams was implicitly telling his children that domestic violence is acceptable. However, the court in *Hoyt* affirmed the protection orders because drinking beer while driving created a substantial risk of harm. *Hoyt* at ¶ 56. The *Hoyt* court never stated that the implied message that it is acceptable to drink alcohol while driving a car created a substantial risk of harm. It described the implied message conveyed by the drinking and driving as an "indirect harm" because the harm from such conduct was remote as opposed to a present threat. *Id.* Indeed, R.C. 2901.01(A)(8) defines "substantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." Therefore, *Hoyt* does not support the state's argument and is distinguishable from the facts of this case.

{¶ 33} This court's decision in *Cleveland Hts. v. Cohen*, 8th Dist. Cuyahoga No. 101349, 2015-Ohio-1636, is more on point. In *Cohen*, a husband and wife

engaged in a physical struggle during which the husband pushed the wife into a wall and caused her to hit her head on a closet. The parties' children witnessed the incident, which resulted in an injury to the wife's head. The husband was subsequently convicted of disorderly conduct, a lesser included offense of domestic violence, and two counts of child endangering. This court reversed the child endangering convictions due to insufficient evidence that the husband's conduct created a substantial risk to the children's health and safety. *Id.* at ¶ 30.

{¶ 34} To prove the "substantial risk" element of child endangering, "'there must be some evidence beyond mere speculation as to the risk of harm that could potentially occur due to a single imprudent act.'" *State v. Hughes*, 3d Dist. Shelby No. 17-09-02, 2009-Ohio-4115, ¶ 21, quoting *Middletown v. McWhorter*, 12th Dist. Butler No. CA2006-03-068, 2006-Ohio-7030, ¶ 11. In reversing the child endangering convictions, the *Cohen* court found there was no evidence that the children were involved in the physical fight between the husband and wife. Therefore, the court found there was "no evidence in the record that the children were at any risk of harm – much less a substantial risk of harm – to their mental or physical health or safety" as a result of the husband's actions. This further court explained:

> Although we have little doubt that (1) hearing one's parents argue about getting a divorce and leaving the family's home and (2) viewing the type of inappropriate and irresponsible behavior exhibited by the parents in this case could have an emotional impact on a child, we cannot say, based on the record before us, that the city met its burden of proof. Simply because the two children were present in the home at the time of the altercation, may have witnessed part of the dispute and

may have been (understandably) upset or confused by their parents' words and actions does not establish that Cohen violated a duty of care, protection or support to his children or that he, with heedless indifference to the consequences of his actions, perversely disregarded a known risk and thereby created a substantial risk to the health or safety of his children. As such, the evidence was insufficient to support Cohen's conviction for child endangering pursuant to R.C. 2919.22(A).

*Id.* at ¶ 30.

{¶ 35} As in *Cohen*, we find no evidence that Jackson-Williams's aggressive behavior toward L.J.W. created a substantial risk to the health and safety of the parties' children. The struggle between Jackson-Williams and L.J.W. was relatively brief and occurred outside of L.J.W.'s car while the children were safely secured inside the car. Although witnessing their parents fight probably had a negative emotional impact on the children, their mere presence at the scene of their parents' domestic dispute did not create a substantial risk to their health or safety. Therefore, there is insufficient evidence in the record to sustain Jackson-Williams's two child-endangering convictions.

{¶ 36} Jackson-Williams argues there was also insufficient evidence to support his menacing by stalking conviction because he contacted L.J.W. for the sole purpose of seeing his family. (Appellant's brief at 24.)

{¶ 37} Jackson-Williams was convicted of menacing by stalking in violation of R.C. 2903.211(A)(1), which states, in relevant part:

No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person

or cause mental distress to the other person or a family or household member of the other person.

A person acts "knowingly" when, "regardless of purpose, * * * the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). A "pattern of conduct" is defined, in relevant part, as:

two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents, * * *. [T]he posting of messages, * * * or receipt of information or data through the use of any form of written communication or an electronic method of remotely transferring information, including, but not limited to, a computer, computer network, computer program, computer system, or telecommunications device, may constitute a "pattern of conduct."

R.C. 2903.211(D)(1).

{¶ 38} L.J.W. testified that she was the victim in Jackson-Williams's prior domestic violence cases. She also testified that he committed another act of domestic violence against her outside an Applebee's restaurant on May 18, 2018, and that he had made threats against her in March 2018. Following the May 18, 2018 incident, L.J.W. told Jackson-Williams not to contact her anymore. Yet, over the course of the ensuing months, Jackson-Williams contacted L.J.W. "daily," even though L.J.W. refused to answer his calls. (Tr. 72.) Jackson-Williams called from different phone numbers, sometimes from a work number and sometimes from friends' phone numbers. (Tr. 72.) He also connected with L.J.W.'s friends and family on Facebook so he could monitor her activities. (Tr. 77.)

{¶ 39} On August 2018, he left a voicemail on L.J.W.'s work phone telling her that he was outside her place of employment. He also called L.J.W. at work and showed up uninvited at her workplace several times without notice. (Tr. 75.) He surprised her at work on three separate days in October 2018, and proved he had been spying on her by telling her exactly where she had parked her car the previous Saturday. Jackson-Williams's persistent efforts to communicate with L.J.W. against her wishes demonstrates a pattern of conduct as defined in R.C. 2903.211(D)(1).

{¶ 40} L.J.W. testified that she was "extremely nervous and scared" when Jackson-Williams rang the buzzer at her apartment at 10:50 p.m. on November 11, 2018, because of his history of domestic violence and his relentless attempts to communicate with her against her wishes. (Tr. 73.) She explained that she never had visitors that late at night, and it "had [her] on edge and very scared." (Tr. 73.) L.J.W.'s testimony is sufficient evidence that Jackson-Williams knowingly engaged in a pattern of conduct that would cause L.J.W. to believe that he intended to cause her physical harm. Therefore, there was sufficient evidence to support Jackson-Williams's menacing by stalking conviction.

{¶ 41} As previously stated, the menacing by stalking charge included a furthermore clause for trespass pursuant to R.C. 2911.211(A), which states, in relevant part:

> No person shall enter or remain on the land or premises of another with purpose to commit on that land or those premises a misdemeanor, the elements of which involve causing physical harm to

another person or causing another person to believe that the offender will cause physical harm to him.

"A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶ 42} It is undisputed that Jackson-Williams came to L.J.W.'s apartment on the night of November 11, 2018. Since L.J.W. had previously told Jackson-Williams not to contact her, his presence at her residence was a trespass. And, as previously explained, the history of domestic abuse combined with Jackson-Williams's presence at L.J.W.'s residence late at night caused her to believe that he was going to harm her. Jackson-Williams trespassed on L.J.W.'s residence while committing menacing by stalking. Therefore, there was sufficient evidence to support the court's guilty finding on the furthermore clause.

{¶ 43} The first assignment of error is sustained as to the child endangering convictions and overruled as to the domestic violence and menacing by stalking convictions.

## B. Manifest Weight of the Evidence

{¶ 44} In the second assignment of error, Jackson-Williams argues his convictions are against the manifest weight of the evidence. Having determined that there was insufficient evidence to support the child endangering convictions,

this assigned error is limited to the domestic violence and menacing by stalking convictions.

{¶ 45} In contrast to sufficiency, "[w]eight of the evidence [involves] 'the inclination of the *greater amount of credible evidence*.'" (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387.

{¶ 46} "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id.* The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 47} Jackson-Williams argues his domestic violence and menacing by stalking convictions are against the manifest weight of the evidence because L.J.W.'s testimony was not credible. He contends L.J.W. was not credible because although she claimed she was injured during the Applebee's incident, she failed to

seek medical treatment and failed to report the incident to police until days later. He contends his own testimony was more credible than that of L.J.W.

{¶ 48} However, as previously stated, the state is not required to prove that a domestic violence victim sustained an actual injury in order to prove domestic violence because "a defendant can be convicted of domestic violence for merely attempting to cause physical harm." *Nielsen*, 66 Ohio App.3d at 612, 585 N.E.2d 906; *Blonski*, 125 Ohio App.3d at 114, 707 N.E.2d 1168 (9th Dist.1997) ("A defendant may be found guilty of domestic violence even if the victim sustains only minor injuries, or sustains no injury at all.").

{¶ 49} L.J.W. did not sustain serious injuries as a result of the domestic violence incident and she had two young children, who would make it more difficult to seek medical treatment. Therefore, it is not surprising that she did not immediately seek medical attention under these circumstances. Furthermore, L.J.W. eventually sought medical treatment at Metro Express Care and was diagnosed with hand sprains in both hands, which is consistent with L.J.W.'s testimony that Jackson-Williams squeezed and twisted them. (*See* medical records, state's exhibit No. 3.) The narrative set forth in medical records is also consistent with L.J.W.'s testimony.

{¶ 50} L.J.W. testified that she attempted to report the domestic violence incident to police the following day and was told to come back another day. She returned the next day and was told to go to a different district, which she did. It was not easy or convenient for L.J.W. to make a police report of the domestic

violence incident, but she persisted. And the trial court had the opportunity to view her demeanor and assess her credibility while she was testifying, and there is nothing in the record contradicting her testimony. Therefore, we find no reason to doubt the trial court's determination that she was a credible witness.

{¶ 51} Furthermore, the state presented evidence to corroborate L.J.W.'s testimony regarding the pattern of conduct necessary to establish menacing by stalking. She authenticated phone logs listing numerous calls made by the defendant to her phone on November 11, 2018. A recording of L.J.W.'s 911 call was also authenticated and entered into evidence. L.J.W.'s testimony was consistent with the narrative she provided to the 911 dispatcher. Therefore, despite Jackson-Williams's argument to the contrary, there was evidence in the record to corroborate L.J.W.'s testimony.

{¶ 52} The second assignment of error is overruled.

### C. Other Acts Evidence

{¶ 53} In the third assignment of error, Jackson-Williams argues the trial court violated his right to due process and a fair trial by allowing evidence of his prior acts to be admitted into evidence even though the evidence was irrelevant and unfairly prejudicial to his defense. Jackson-Williams asserts the court erred in allowing the state to present evidence that he emailed L.J.W. and visited her workplace.

{¶ 54} The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the

absence of an abuse of discretion that has created material prejudice. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43.

{¶ 55} Evidence of a person's character or trait of character is generally not admissible for the purpose of proving action in conformity therewith on a particular occasion. Evid.R. 404(A). *See also* R.C. 2945.59. However, evidence of other crimes, wrongs, or acts may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). In *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, the Ohio Supreme Court set forth the following three-step analysis for determining whether other acts evidence is admissible:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401.
>
> The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B).
>
> The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R. 403.

*Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278 at ¶ 20.

{¶ 56} Evidence of Jackson-Williams's prior interactions with L.J.W. were relevant to prove the pattern of conduct necessary to establish menacing by stalking. It was also relevant to explain why L.J.W. feared for her safety when

Jackson-Williams showed up at her residence uninvited at 10:50 p.m. on the night of November 11, 2018. Thus, the evidence was relevant and not offered to prove that Jackson-Williams was acting in conformity with a particular character trait. We, therefore, turn to the question of whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

{¶ 57} In *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, the court defined "undue prejudice" as "'that quality of evidence which might result in an improper basis for a jury decision'" because it "'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish.'" *Id.* at ¶ 36, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001). The *Creech* court further explained that the probative value of evidence is evaluated by comparing it to evidentiary alternatives:

> Probative value is measured partially by the relative scarcity of evidence on the same issue. * * * That is, if the state offers evidence for which there is an evidentiary alternative that has substantially similar or greater probative value but is less prejudicial, the probative value of the state's evidence must be discounted. The danger of unfair prejudice is then weighed against this reduced probative value.

*Id.* at ¶ 22, citing *Old Chief v. United States*, 519 U.S. 172, 185, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

{¶ 58} As previously stated, evidence of Jackson-Williams's prior interactions with L.J.W. was relevant to prove the pattern of conduct element of the menacing by stalking offense. It was also relevant and necessary to explain why L.J.W. was fearful of Jackson-Williams. There were no evidentiary

alternatives for proving these elements of the menacing by stalking offense. Although the evidence was prejudicial to Jackson-Williams, the probative value of the evidence substantially outweighed the danger of unfair prejudice under these circumstances. Therefore, the evidence was properly admitted into evidence.

{¶ 59} The third assignment of error is overruled.

### D. Consecutive Sentence

{¶ 60} In the fourth assignment of error, Jackson-Williams argues the trial court erred in imposing consecutive sentences. He contends consecutive sentences are not supported by the record and are contrary to law.

{¶ 61} When reviewing felony sentences, we apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1, 21-23. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it clearly and convincingly finds either (1) the record does not support certain specified findings, or (2) the sentence imposed is contrary to law.

{¶ 62} A sentence is "contrary to law" if the sentence falls outside the statutory range for the particular degree of offense, the trial court fails to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12 for individual sentence, or the trial court fails to make the findings required by R.C. 2929.14(C) for the imposition of consecutive sentences. *State v. Wilkins*, 8th Dist. Cuyahoga No. 107982, 2019-

Ohio-4061, ¶ 20, 31-33.  A matter is "clear and convincing" if it "'produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'"  *Id.* at ¶ 20, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 63} To impose consecutive sentences under R.C. 2929.14(C)(4), the trial court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender, that such sentences are not disproportionate to the seriousness of the conduct and to the danger the offender poses to the public, and that at least one of the following also applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under postrelease control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 64} To comply with R.C. 2929.14(C)(4), the trial court must make the findings in open court and on the record at the sentencing hearing.  This means "'the [trial] court must note that it engaged in the analysis' and that it 'has considered the statutory criteria and specifie[d] which of the given bases warrants its decision.'"  *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d

659, ¶ 26, quoting *State v. Edmonson*, 86 Ohio St.3d 324, 326, 715 N.E.2d 131 (1999).

{¶ 65} Further, the reviewing court must be able to discern that the record supports the trial court's findings. *State v. Davis*, 8th Dist. Cuyahoga No. 102639, 2015-Ohio-4501, ¶ 21, citing *Bonnell* at ¶ 29. A trial court is not, however, required to state its reasons for its findings, nor is it required to give a rote recitation of the statutory language, "provided that the necessary findings can be found in the record and are incorporated in the sentencing entry." *Bonnell* at ¶ 37.

{¶ 66} In imposing the consecutive sentences in this case, the trial court stated, in relevant part:

> I've considered the seriousness and recidivism factors as required under our sentencing statutes. Mr. Jackson-Williams' behavior towards family members is concerning. I think this is the fourth Common Pleas Cuyahoga County domestic violence case. He had been found guilty of child endangering before. I don't know what Mr. Jackson-Williams will need to stop. All I can do is separate Mr. Jackson-Williams for a period of time from his victims to keep them safe, and I intend to do so and I intend to so by imposing consecutive sentences. His criminal history demonstrates that consecutive terms are needed to protect the public.
>
> * * *
>
> In Case 634572, on the menacing by stalking count, I am going to impose a 12-month sentence consecutively to Case 629562. Again, that's consecutive because of your criminal history and it is needed to protect the victim and her family from future harm. A total sentence of 3 and-a-half years is not disproportionate to the harm caused here and I do note that the menacing by stalking was committed while he was capias on the domestic violence case. He was aware that he had warrants on another case. That testimony came out in that regard.

Thus, the court made all the findings required by R.C. 2929.14(C) for the imposition of consecutive sentences at the sentencing hearing. The court found that consecutive sentences were necessary to protect the victims and the public, were not disproportionate to Jackson-Williams's conduct, and that Jackson-Williams committed the menacing by stalking offense while he was awaiting trial for domestic violence. The trial court also journalized the findings in the sentencing entry as required by *Bonnell*. Therefore, the consecutive sentences are not contrary to law.

{¶ 67} We further find that consecutive sentences are supported by the record. Jackson-Williams had two prior domestic violence convictions before he committed the domestic violence on May 18, 2018. L.J.W. was the victim of all three domestic violence incidents. The record also shows that Jackson-Williams ignored L.J.W.'s requests to leave her alone and pursued her for several months before he was finally arrested. Jackson-Williams has demonstrated that he cannot keep himself away from L.J.W. and that a prolonged prison term created by a consecutive sentence is the only way to protect L.J.W. from Jackson-Williams's endless pursuit of her. Therefore, consecutive sentences are supported the record.

{¶ 68} The fourth assignment of error is overruled.

{¶ 69} Judgment affirmed in part and reversed in part. We affirm Jackson-Williams's domestic violence and menacing by stalking convictions, but remand the case to the trial court to vacate Jackson-Williams's two child endangering convictions due to lack of sufficient evidence.

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed in part, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

EILEEN T. GALLAGHER, ADMINISTRATIVE JUDGE

PATRICIA ANN BLACKMON, J., and
RAYMOND C. HEADEN, J., CONCUR