[Cite as *State v. Lynch*, 2025-Ohio-2769.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                          :

    Plaintiff-Appellee,                      :

    v.                                                      :        No. 114304

JOSHUA R. LYNCH,                              :

    Defendant-Appellant.              :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
               AND REMANDED
**RELEASED AND JOURNALIZED:** August 7, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-678657-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Kerry A. Sowul, Assistant Prosecuting
Attorney, *for appellee.*

Joseph V. Pagano, *for appellant.*

DEENA R. CALABRESE, J.:

{¶ 1} Defendant-appellant Joshua R. Lynch ("Lynch") appeals his convictions and sentence. Following a bench trial, the trial court convicted Lynch of two counts of murder, two counts of felonious assault, two counts of having weapons

while under disability, endangering children, and gross abuse of a corpse. Lynch argues that the trial court erred by failing to hold a competency hearing on the record, by not ruling on his motion to waive his right to counsel, by admitting the testimony of an eight-year-old witness without a separate competency hearing, and by denying his Crim.R. 29 motion. Lynch also argues that his convictions are against the manifest weight of the evidence. Finally, Lynch contends that the trial court erred by failing to calculate and award him jail-time credit and by imposing a consecutive sentence for firearm specifications attendant to Counts 2 and 3, where the counts merged as allied offenses.

{¶ 2} For the following reasons, we affirm Lynch's convictions and sentence. However, we reverse and remand the case to the trial court for a calculation of jail-time credit.

## I. Facts and Procedural History

{¶ 3} On February 8, 2023, officers with the Cleveland Police Department responded to a call at 16210 Huntmere Avenue in Cleveland ("Huntmere house"). There, they found a woman's body located in a vehicle in the backyard. The woman was later determined to be Lynch's estranged wife, Jovon Lynch ("Jovon"). Jovon and Lynch have one daughter together, J.L. Lynch was later arrested and charged with Jovon's murder.

{¶ 4} On February 27, 2023, the Cuyahoga County Grand Jury indicted Lynch on the following counts:

1. Aggravated murder in violation of R.C. 2903.01(A), an unclassified felony, with one- and three-year firearm specifications;

2. Murder in violation of R.C. 2903.02(A), an unclassified felony, with one- and three-year firearm specifications;

3. Murder in violation of R.C. 2903.02(B), an unclassified felony, with one- and three-year firearm specifications;

4. Kidnapping in violation of R.C. 2905.01(A)(2), a felony of the first degree, with one- and three-year firearm specifications;

5. Felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree, with one- and three-year firearm specifications;

6. Felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree, with one- and three-year firearm specifications;

7. Having weapons while under disability in violation of R.C. 2923.13(A)(2), a felony of the third degree, with a one-year firearm specification;

8. Having weapons while under disability in violation of R.C. 2923.13(A)(3), a felony of the third degree, with a one-year firearm specification;

9. Endangering children in violation of R.C. 2919.22(A), a felony of the fourth degree, with a one-year firearm specification and a furthermore clause;

10. Grand theft in violation of R.C. 2913.02(A)(1), a felony of the fourth degree, with a one-year firearm specification;

11. Gross abuse of a corpse in violation of R.C. 2927.01(B), a felony of the fifth degree, with a one-year firearm specification.

{¶ 5} Lynch was referred to the court psychiatric clinic on July 11, 2023, to be evaluated for competency to stand trial pursuant to R.C. 2945.371. In an August 9, 2023 report, the court psychiatric clinic recommended that Lynch be transported to an inpatient facility for a competency evaluation. On August 10, 2023, the trial court ordered that Lynch complete a 20-day inpatient competency evaluation at Twin

Valley Behavioral Health Care. At a pretrial held on August 1, 2024, defense counsel stated that "Lynch has been found to be competent." (Tr. 24.)

{¶ 6} Lynch executed a jury-trial waiver on August 1, 2024, and a bench trial commenced on August 5, 2024. Witness testimony at trial revealed the following series of events that took place on February 7 and 8, 2023.

{¶ 7} J.L. testified that she was eight years old and in the third grade. Her mother's name is Jovon and her father is Joshua Lynch. She currently lives with her grandmother in Cleveland and attends school around the corner from her home. Before living with her grandmother, J.L. testified that she lived with her mother, Jovon. She did not recall where that house was, but remembered that it was brown, red, and yellow, and that they lived upstairs. J.L. identified the defendant as Lynch. She also stated that she was advised to "[t]ell the truth" when she testified.

{¶ 8} J.L. testified that on the night of the incident, Lynch came over in the evening and was playing cards with Jovon. Only she, Jovon, and Lynch were at the Huntmere house that evening. J.L. was on the couch watching them play cards until she fell asleep. At some point after she fell asleep, Lynch woke her up, covered her face, and put her in an upstairs bedroom. He later told her to go outside and help him look for car keys. J.L. testified that there was blood "on the stairs and all over the floors." J.L. stated that while she was looking for the keys, her mother was upstairs, but Lynch "dragged [Jovon] downstairs and put her in [his] car." Lynch originally told J.L. to get into his car, the car her mother was in, but then Lynch

found the keys to Jovon's vehicle. J.L. testified that she and Lynch left in "my mom's" car. After going to the store, the car ran out of gas.

{¶ 9} J.L. testified that she was nervous and scared that evening because she saw her mother's body in the car. J.L. testified that she saw a gun in Lynch's pocket that was "[b]lack or a little bit brown." She also noticed that Lynch's black boots had blood on them. She remembered that Lynch took off the boots and left them, along with the gun, at someone's house. Lynch's niece, Unique Davis ("Davis"), met J.L. at the gas station, and drove her to Lynch's mother's, Alice Whitley's ("Whitley"), house. During this time, and until she arrived at her grandmother's home, J.L. was only wearing panties and a blanket.

{¶ 10} Oshay Carswell ("Carswell") testified that Jovon was his girlfriend. He lived with Jovon and her daughter, J.L., in the upstairs unit of the Huntmere house. Although Carswell and Jovon had been in a relationship for about six months, Jovon was still married to Lynch. Carswell last saw Jovon on February 7, 2023, when she drove him to a medical appointment and then to his sister's house.

{¶ 11} After Jovon took Carswell to his sister's house, they continued to communicate that day and into the night via text and telephone calls. In those communications, he and Jovon argued and he questioned Jovon about why she allowed Lynch into the Huntmere house. At one point, Lynch came onto the phone and spoke with Carswell. Carswell asked Lynch to put Jovon back on the phone. She did not come back on the phone. Instead, Carswell heard a loud boom and the

phone hung up. He tried to call and text Jovon but was not able to make contact with her. He also tried to call J.L.'s phone, and there was no answer.

{¶ 12} The following morning, February 8, 2023, Carswell again tried calling and texting Jovon on her phone and on J.L.'s cell phone. When he was still unable to reach Jovon or J.L., Carswell called Jovon's mother, Annette. Annette called the school and learned that J.L. was not at school. Carswell saw a post on the Cleveland Remembrance Page that referenced a deceased woman who was found in a vehicle on Huntmere Avenue. Around 9:00 or 10:00 a.m., Carswell collected Annette from her home and together they went to the Huntmere house.

{¶ 13} Maurice Golden testified that he resides at 16230 Huntmere Avenue in Cleveland. In February 2023, a woman and her child lived next door. On February 8, 2023, after talking with his upstairs neighbor, he went outside to the Huntmere house's yard. He observed a large piece of clear plastic in the driveway with blood on it. He also observed a black car in the backyard stuck in the mud with the license plate torn off. He called 911 and requested a wellness check. He stated that Jovon drove a black Equinox that was not in the driveway that morning. Before that morning, he had never seen the black vehicle that he found stuck in the mud in the backyard of the Huntmere house.

{¶ 14} Whitley testified that she has six children, including Lynch. She identified Lynch in the courtroom. She testified that Lynch had borrowed her black Infiniti and, on February 8, 2023, she texted Lynch to ask where her vehicle was. Lynch responded by text, indicating that there was "a body in it" and he was "going

to jail for good." Lynch also called her that morning because he was out of gas. Whitley called her granddaughter, Davis, and asked her to take money to Lynch so he could purchase gas. She later learned from Davis that J.L. was with Lynch.

{¶ 15} Davis testified that Lynch is her uncle, and she identified him in the courtroom. Davis testified that her mother, Jamika Lowe,[1] called her and asked her to collect Lynch. Davis met Lynch at a gas station. Lynch asked if J.L. could ride with her. J.L. was wearing underwear and a blanket and did not have shoes on. Davis further testified that she took J.L. to Whitley's house where Whitley provided J.L. with clothes. J.L. was not able to stay there, so Davis drove her to Jamika's house. After learning that the Cleveland police were looking for J.L., Davis drove J.L. to the Elyria Police Department.

## A. The Police Investigation

{¶ 16} Cleveland Police Officer Kortez Johnson testified that he was one of the first officers to arrive at the Huntmere house on the morning of February 8, 2023. He found a woman who was not breathing in the passenger side of a vehicle. Officer Johnson observed a significant amount of blood trailing from the side door of the residence, down the driveway, to the passenger side of the vehicle. Inside the vehicle, he observed blood on the windows of the vehicle and on the body of the woman. Police entered the upstairs unit to search for the woman's child. Inside the house, Officer Johnson observed a bloody shoe in the hallway, a large amount of wet

---

[1] Jamika Lowe is also referred to as Jamika Dawson.

and dry blood on the floor and walls in the kitchen, and blood on the back landing of the staircase, leading down the staircase to the side door. He also observed a live ammunition round on the floor in the landing area, right outside the kitchen. The downstairs unit appeared to be unoccupied.

{¶ 17} Deputy Cody Hutchinson testified that on February 8, 2023, he responded to the Huntmere house at around 9:00 a.m. On that date, he was employed by the Cleveland Division of Police as a patrol officer with the Fifth District Vice Unit. He observed a black Infiniti that appeared to be stuck in the mud in the backyard. The woman in the vehicle did not appear to be breathing and had blood on her. There was also a piece of plastic near the side door with blood on it. He learned from neighbors that the woman had a school-age child. Inside the house he observed bloody footprints and dried blood smeared on the kitchen floor. Bloody footprints went down the stairs and outside. The downstairs unit appeared to be vacant.

{¶ 18} Cleveland Police Department Crime Scene Records Unit Detective Thomas Lascko testified that on February 8, 2023, he processed the crime scene at the Huntmere house. This included taking photographs of the inside and outside of the Huntmere house, the driveway, and the black Infiniti. He took a total of 189 photographs that day. The photographs were entered into evidence. They show that the Huntmere house is red, yellow, and brown, as J.L. described it. (State's exhibit No. 2.) They also show Jovon in the Infiniti, with a significant amount of blood on her, and her breasts partially exposed. (State's exhibit No. 19.) There is a blood trail

on the stairway and blood on the landing and walls in the stairwell. (State's exhibits Nos. 68, 70, 72, 74.) There is also suspected blood all over the kitchen floor. (State's exhibit No. 80.) Det. Lascko also collected evidence.

{¶ 19} Detective Charles Schultz testified that he was a homicide detective assigned to the case. He obtained a warrant to search Whitley's apartment. Two cell phones were recovered during the search of Whitley's apartment. She signed a consent form allowing her phone data to be downloaded. The information from her phone revealed calls and texts between Whitley and Lynch, who was using J.L.'s phone. At 8:08 a.m. on February 8, 2023, there was a 15-minute telephone conversation between Whitley and Lynch, then there were several calls between them over the next hour, as well as several calls between Whitley and her granddaughter Davis. There was also the following text-message exchange between Whitley and Lynch:

> Whitley: Wheres the car at
>
> Lynch:   It's a body in it
> I'm going to jail for good
> Word
>
> Whitley: Sorry to hear that buddy
> Who's in the truck buddy

(State's exhibit No. 283.)

{¶ 20} Felicia Lee testified that she resides at 16203 Huntmere, Cleveland, Ohio, across the street from the Huntmere house where Jovon resided. She has cameras on the exterior of her house that record traffic at the front of her house and

the area around the garage. The Huntmere house can be seen in the footage from the cameras recording at the front of the house. Officers with the Cleveland Police Department accessed surveillance footage taken by her cameras on February 7 and 8, 2023. (State's exhibit No. 285.)

{¶ 21} Cleveland Police Homicide Detective Stephen Loomis testified he was assigned to investigate the homicide of Jovon Lynch. Detective Loomis spoke with several of Jovon's neighbors on February 8, 2023. He learned that Jovon drove a Chevrolet Equinox that was not in the driveway at that time. He learned that she had a child, J.L., who was unaccounted for. He also learned that the Infiniti where Jovon was found belonged to Lynch's mother, Whitley. He learned from Davis that she met up with Lynch to collect J.L. He obtained surveillance from the BP gas station in Mansfield, Ohio, exit 169 of I-71 at 8:53 a.m. on February 8, 2023. The video shows Davis moving J.L. from an Equinox into Davis's vehicle. It also shows Davis pump gas into the Equinox.

{¶ 22} Detective Loomis further testified regarding the surveillance video obtained from Felicia Lee, the neighbor who resided across the street from Jovon and J.L. The video showed the Infiniti pull into the driveway at 7:56 p.m. on February 7, 2023. From 1:41 a.m. to 1:45 a.m., flickering vehicle lights can be seen coming from the backyard of the Huntmere house. Detective Loomis believed the lights were reverse lights from a vehicle. Moments after, another set of car lights came on and Jovon's Chevrolet Equinox is seen backing out of the driveway at 1:47

a.m. In watching the video, Detective Loomis did not observe anyone else go into the residence that evening.

{¶ 23} Dr. Joseph Felo, the Chief Deputy Medical Examiner and Forensic Pathologist with the Cuyahoga County Medical Examiner's Office, testified that he reviewed and signed the medical examiner's verdict regarding Jovon's death. The cause of death was determined to be gunshot wounds, and the manner of death was determined to be homicide. The autopsy revealed that Jovon had two separate penetrating gunshot wounds to her head. The first bullet entered the back of her scalp and traveled from the back towards the front, going slightly downward. He testified that she would have immediately collapsed and lost consciousness and died after the first shot. The second bullet was fired at a closer range. It entered her left cheek and traveled slightly downward. She also suffered blunt-force injuries to her forehead, a bruised tongue, and abrasions on the back and side of her left foot.

{¶ 24} DNA Analyst Lisa Moore with the Cuyahoga County Regional Forensic Science Laboratory's DNA Department testified that she conducted the DNA testing of the evidence. Police submitted DNA standards from Lynch and Jovon. Lynch's DNA was present on the exterior passenger door of the Infiniti. Jovon's blood was found on the exterior driver door handle, steering wheel, gear shifter, and seat controls of the Infiniti, as well as a mop pad found inside of the Huntmere house. A match to Lynch's DNA was found on swabs from the right underarm of the yellow shirt Jovon was wearing when she was found.

{¶ 25} On August 8, 2024, the trial court found Lynch guilty as charged on Counts 2, 3, 5, 6, 9, and 11, and their attendant firearm specifications, and guilty on Counts 7 and 8. The trial court found Lynch not guilty of Count 10 and granted his Crim.R. 29 motion on Counts 1 and 4. Lynch's Crim.R. 29 motion was denied on the remaining counts. On August 15, 2024, Lynch was sentenced to life imprisonment with parole eligibility after serving a full 28.5 years.

{¶ 26} On August 27, 2024, Lynch filed a notice of appeal, raising the following assignments of error for our review:

> 1. The trial court erred when it failed to comply with the law to sufficiently establish appellant's competency to stand trial in violation of Ohio law and his federal and state constitutional rights to due process.
>
> 2. The trial court erred when it failed to rule on Appellant's motions to represent himself and deprived him of his federal and state constitutional rights.
>
> 3. Court erred by admitting the testimony of an 8 year old witness whose competency to testify was not established and/or appellant's Sixth and Fourteenth Amendment rights were violated when counsel did not object to it on the grounds of incompetency.
>
> 4. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish the elements necessary to support the convictions beyond a reasonable doubt.
>
> 5. Appellant's convictions are against the manifest weight of the evidence.
>
> 6. The trial court erred by failing to notify and provide appellant with jail time credit to which he was entitled to by law
>
> 7. The imposition of a separate consecutive sentence for a firearm specification that was attendant to a conviction that was merged

violates double jeopardy and results in cumulative punishments and consecutive sentences were imposed contrary to law.

## II. Law and Analysis

### A. Competency

{¶ 27} In his first assignment of error, Lynch argues that the trial court erred when it failed to sufficiently establish his competency to stand trial. Lynch does not dispute that he was competent to stand trial; rather, he argues that the trial court erred when it failed to hold a hearing to determine his competency to stand trial, by requiring that a written report of the evaluation be filed with the trial court, and by failing to make a finding about his competency.

{¶ 28} Incompetency is defined as a criminal defendant's inability to understand "the nature and objective of the proceedings against him or of presently assisting in his defense." R.C. 2945.37(A). *State v. Bock*, 28 Ohio St.3d 108, 110 (1986). *See also State v. Hough*, 2022-Ohio-4436. Pursuant to R.C. 2945.37(G), a criminal defendant is rebuttably presumed to be competent to stand trial. *State v. Barton*, 2006-Ohio-1324, ¶ 56.

{¶ 29} R.C. 2945.37(B) provides in pertinent part:

In a criminal action in a court of common pleas, a county court, or a municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before the trial has commenced, the court *shall* hold a hearing on the issue as provided in this section.

(Emphasis added.)

{¶ 30} The trial court's failure to hold a competency hearing is harmless error unless the reviewing court finds a sufficient indicia of incompetency in the record. *Bock* at 111. On review, we consider both evidence of competence and evidence of incompetence. *State v. Mills*, 2023-Ohio-4716, ¶ 21, citing *Bock* at 110-111; *State v. Berry*, 72 Ohio St.3d 354, 362 (1995). We have previously found that "the statute does not require the court to make specific findings on the record regarding a defendant's competency, 'above and beyond the [competency] report itself.'" *State v. Smith*, 2020-Ohio-3666, ¶ 12 (8th Dist.), quoting *State v. Dienes*, 2012-Ohio-4588, ¶ 10 (8th Dist.).

{¶ 31} In this case, Lynch completed an inpatient competency evaluation at Twin Valley Behavioral Health Care, as ordered by the court. At an August 1, 2024 pretrial, defense counsel stated that "Lynch has been found to be competent." (Tr. 24.)

{¶ 32} We review the record for indications of Lynch's competence or incompetence, focusing on Lynch's participation in hearings held on April 15, 2024, July 29, 2024, and August 1, 2024. The April 15, 2024 hearing was held after Lynch filed a motion to represent himself. When asked about his motion, Lynch told the trial court he filed the motion "[b]ecause I'm not getting the proper documentation that I need and we not talking about anything relevant towards this case, and my attorneys said that they feel like they can't beat the case or something like that." (Tr. 5-6.) He also stated that his lawyers "feel like they can't win the case, so I feel

like we should just go our separate ways." (Tr. 6.) He also stated he had completed the tenth grade and was working towards earning a GED.

{¶ 33} In a hearing held on July 29, 2024, the State put a plea offer on the record. During the colloquy, the court discussed the plea offer and repeatedly asked Lynch if he understood the plea offer. Lynch answered in the affirmative each time.

{¶ 34} At a hearing held on August 1, 2024, Lynch waived his right to a trial by jury. During the discussion on the record, the trial court asked if he knew what the waiver meant. Lynch responded, "I waive my rights to a jury trial." He also asked the trial court, "Well, it's for a bench trial, right?" When the trial court asked defense counsel if there were any concerns as to whether the waiver was knowingly, intelligently, and voluntarily made, counsel responded, "Your honor, Mr. Lynch has been found to be competent." (Tr. 23-24.)

{¶ 35} The record reveals that no hearing was held to establish competency, the parties never stipulated to Lynch's competency, and the court never made any finding regarding his competency to stand trial. Nonetheless, the record is clear that Lynch was evaluated for his competency to stand trial, that defense counsel reviewed the competency report, and that defense counsel stated Lynch was competent. Also, the record fails to reveal sufficient indicia of incompetency, and Lynch points to no instances that suggest incompetency. In fact, review of the record shows that during each hearing, Lynch understood the proceedings and was able to assist in his defense. Therefore, Lynch's first assignment of error is overruled.

**B. Motions to Waive Right to Counsel**

{¶ 36} In his second assignment of error, Lynch argues the trial court erred when it failed to rule on his motions to represent himself and deprived him of his right to waive counsel.

{¶ 37} A criminal defendant has a constitutionally protected right to self-representation. *Faretta v. California*, 422 U.S. 806 (1975). The right to self-representation, however, is waived if it is not timely and unequivocally asserted. *State v. Pankey*, 2008-Ohio-3091, ¶ 13 (7th Dist.), citing *State v. Cassano*, 2002-Ohio-3751, ¶ 35, 38. When properly raised, "the denial of the right to self-representation is reversible error per se[.]" *State v. Reed*, 74 Ohio St.3d 534, 535 (1996), citing *McKaskle v. Wiggins* 465 U.S. 168, 177 (1984). After a hearing on a waiver of the right to counsel, "there [is] no need for the court to ensure the particulars of appellant's state of mind regarding the waiver until it [is] definitively readvised that defendant still wishe[s] to proceed without counsel after hearing the court's advice." *Pankey* at ¶ 27.

{¶ 38} On March 4, 2024, Lynch filed a pro se motion to waive his right to counsel. On April 2, 2024, Lynch filed a "Motion to Denied Continue through Counsel" where he referenced a waiver of his right to counsel. On April 15, 2024, the trial court held a hearing on Lynch's motion to waive counsel. At the hearing, in response to the trial court's questions, Lynch expressed his frustration because he was "not getting the proper documentation that [he] need[ed]" and because his attorneys "feel like they can't win the case[.]" (Apr. 15, 2024 tr. 5-6.) He also stated

he completed the tenth grade and that he had previously never represented himself at trial. At the end of the hearing, the trial court stated the hearing on Lynch's motion to represent himself would be continued and suggested Lynch reconsider his motion. Lynch appeared before the trial court again for pretrials on July 29, 2024, and August 1, 2024. On both occasions, the trial court engaged Lynch in a colloquy regarding trial issues, but Lynch did not raise the issue of waiving his right to counsel again.

{¶ 39} Since Lynch did not inform the trial court that he still wished to proceed without counsel following the April 15, 2024 hearing on his motion, the trial court did not err when it failed to rule on his motion to waive counsel. Therefore, Lynch's second assignment of error is overruled.

## C. Competency of a Witness

{¶ 40} In his third assignment of error, Lynch argues that the trial court erred by admitting the testimony of an eight-year-old witness whose competency to testify was not established and that trial counsel was ineffective for failing to object to the testimony on grounds of incompetency.

{¶ 41} Lynch argues that trial counsel was ineffective for failing to object to J.L.'s testimony. "To establish a claim of ineffective assistance of counsel, [the appellant] must demonstrate that (1) his counsel was deficient in some aspect of his representation and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *In re S.A.*, 2019-Ohio-4782, ¶ 46 (8th Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). On

review, "judicial scrutiny of an attorney's work must be highly deferential." *Strickland* at 689. "'[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Id.*

{¶ 42} Lynch did not object to the testimony at trial; thus, we review for plain error pursuant to Crim.R. 52(B). *State v. Azali*, 2023-Ohio-4643, ¶ 10 (8th Dist.).

{¶ 43} Evid.R. 601 provides that "'[e]very person is competent to be a witness except as otherwise provided in these rules.'" *State v. Simmons*, 2024-Ohio-3188, ¶ 21 (8th Dist.), quoting *Azali* at ¶ 11. R.C. 2317.01 states that "[a]ll persons are competent witnesses except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

{¶ 44} This court has previously found that a child testifying

> is presumed competent unless she demonstrates the inability to receive accurate impressions of fact or to observe acts about which she will testify; the inability to recollect those impressions or observations; the inability to communicate what she observed; her understanding of truth and falsity; and her appreciation of her responsibility to be truthful.

*Simmons* at ¶ 23, citing *Azali* at ¶ 13.

{¶ 45} J.L. testified at the trial. She was able to answer questions such as her name, her parents' names, where she lived and who she lived with, where she went to school, and what grade she was in. J.L. was also able to identify her father in the

courtroom.  She stated that she had been advised by the State to "[t]ell the truth" when she testified.

{¶ 46} There is nothing in the record that indicates that J.L. was unable to receive just impressions of the facts, to recollect those impressions, or to communicate what she observed.  Therefore, the trial court did not err in its decision not to conduct a hearing to determine her competency to testify.  Thus, Lynch was not denied effective assistance of counsel where his trial attorney did not object to the trial court's decision.

### D. Crim.R. 29 Motion

{¶ 47} In his fourth assignment of error, Lynch argues that the trial court erred when it denied his Crim.R. 29 motion for acquittal because the State failed to present sufficient evidence to establish elements to support the convictions.

{¶ 48} Crim.R. 29(A) provides that a court "shall order the entry of the judgment of acquittal of one or more offenses . . . if the evidence is insufficient to sustain a conviction of such offense or offenses."  A Crim.R. 29 motion questions the sufficiency of the evidence, thus, we apply the same standard of review to a trial court's ruling on a Crim.R. 29 motion as we do in reviewing challenges to the sufficiency of the evidence presented at trial.  *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.).

{¶ 49} This court has recently reaffirmed that "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if

believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Spencer*, 2024-Ohio-5809, ¶ 15 (8th Dist.), citing *State v. Murphy*, 91 Ohio St.3d 516 (2001). The appellate court views the evidence "'in a light most favorable to the prosecution'" to determine whether "'any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Spencer* at ¶ 15, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), at paragraph two of the syllabus. The inquiry is whether the prosecution has met its "burden of production" at trial. *State v. Dyer*, 2007-Ohio-1704, ¶ 24 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). "'In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Cleveland v. Williams*, 2024-Ohio-3102, ¶ 10 (8th Dist.), quoting *Thompkins* at 386; *see also Cleveland v. Neal*, 2024-Ohio-1467, ¶ 26 (8th Dist.). Appellate courts are not to assess "whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Dyer* at ¶ 24.

{¶ 50} "Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Zadar*, 2011-Ohio-1060, ¶ 18 (8th Dist.), citing *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988), *Jenks* at 272.

{¶ 51} Lynch made a Crim.R. 29 motion for acquittal at the close of the State's case and again at the end of the trial. At the close of the State's case, the trial court granted Lynch's Crim.R. 29 motion on Counts 1 and 4, and dismissed those charges.

Lynch was found not guilty on Count 10. The trial court overruled Lynch's Crim.R. 29 motion on the remaining counts and subsequently found him guilty of Counts 2, the firearm specification on merged Count 3, and Counts 5, 6, 7, 8, 9, and 11.

{¶ 52} Lynch's argument in favor of the Crim.R. 29 motion for acquittal on the remaining counts centers around identity, arguing that the State did not establish that Lynch was the individual who committed the crimes. He pointed out the lack of DNA evidence and argued that because of Carswell's suspicious actions and lack of action during these events, Carswell should have been investigated as a suspect. The trial court acknowledged that Lynch's argument centered around identity when it stated, "[T]he Court is overruling your arguments to the other counts. There was more than sufficient evidence to put the Defendant at the scene, and identity really is the only issue that we're dealing with here at this trial."

{¶ 53} We have previously found that "a party cannot raise new arguments and legal issues for the first time on appeal, and the failure to raise an issue or legal argument before the trial court waives that issue or legal argument for appellate purposes." *State v. Mosby*, 2024-Ohio-5210, ¶ 58 (8th Dist.), citing *State v. Almazan*, 2021-Ohio-1718, ¶ 8 (8th Dist.). Nevertheless, we will discuss each of Lynch's arguments.

### E. Counts 2 and 3, Murder, and Counts 5 and 6, Felonious Assault

{¶ 54} Lynch argues the trial court erred when it did not grant his Crim.R. 29 motion for acquittal on Counts 2 and 3, murder, in violation of R.C. 2903.02(A) and (B), and two counts of felonious assault under R.C. 2903.11(A)(1) and (2). Lynch

argues that the State had to prove that he purposely caused the death of Jovon or that he had the specific intention to knowingly cause physical harm to Jovon or attempted or caused physical harm to her by means of a deadly weapon that proximately caused the death of Jovon.

{¶ 55} Lynch argues the State did not establish he acted purposely. "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A)

{¶ 56} J.L. testified that only she, Jovon, and Lynch were in the house that evening. She also testified that Lynch had a gun. Jovon suffered two gunshot wounds to the head, and after the first shot she would have lost consciousness. She also suffered other injuries. Lynch's DNA was found on the exterior passenger door of the black Infiniti and on the underarm of the shirt Jovon was wearing when she was found.

{¶ 57} We find a rational trier of fact could have found that Lynch purposely caused the death of Jovon or that he had the specific intention to knowingly cause physical harm to Jovon or attempted or caused physical harm to her by means of a deadly weapon that proximately caused the death of Jovon. Therefore, the trial court did not err when it overruled Lynch's Crim.R. 29 motion for acquittal on Counts 2 and 3, and Counts 5 and 6.

**F. Counts 7 and 8, Weapons While Under Disability**

{¶ 58} Lynch argues the trial court erred when it did not grant his Crim.R. 29 motion for acquittal on Counts 7 and 8, having weapons while under disability under R.C. 2923.13(A)(2). He further argues the State had to prove that he knowingly acquired, had, carried, or used a firearm or dangerous ordnance and was under indictment for or had been convicted of any felony offense of violence.

{¶ 59} To establish a weapon while under disability under R.C. 2923.13(A)(2), the State must show that Lynch knowingly acquired, had, or used a firearm or dangerous ordnance and was under indictment or had been convicted of any felony offense of violence. *State v. Tejeda*, 2025-Ohio-1449, ¶ 23 (8th Dist.). As previously discussed, J.L. testified that she observed a gun in Lynch's pocket while the events in this case took place. Lynch does not dispute that he had previously been convicted of a felony offense of violence.

{¶ 60} We find a rational trier of fact could have found that Lynch had a weapon while under disability on or about February 8, 2023. Thus, the trial court did not err when it overruled Lynch's Crim.R. 29 motion for acquittal on Counts 7 and 8, having weapons while under disability.

**G. Count 9, Child Endangering**

{¶ 61} Lynch next argues that the trial court erred when it did not grant his Crim.R. 29 motion for acquittal on Count 9, endangering children, in violation of R.C. 2919.22(A). Lynch argues that the State had to prove that he was the parent of

J.L. and that he recklessly created a substantial risk to her health or safety by violating a duty of care, protection, or support.

{¶ 62} "[T]o support a conviction for child endangering under R.C. 2919.22(A), it must be established, beyond a reasonable doubt, that [the criminal defendant] (1) recklessly (2) created a substantial risk to the health or safety of one or more of his children (3) by violating a duty of care, protection or support." *Cleveland Hts. v. Cohen,* 2015-Ohio-1636, ¶ 25 (8th Dist.). R.C. 2901.22(C) defines "recklessly" as follows:

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶ 63} We have previously found no evidence of child endangering when children witnessed an altercation involving their parents but were not at risk of harm themselves. *Cohen* at ¶ 29. In *Cohen*, the parents were arguing and the two children both testified they witnessed their mother assault their father during an ongoing heated argument. The children in *Cohen* witnessed domestic violence, and their mother sustained a laceration on her forehead and a swollen nose. *Id.* at ¶ 12. We recognized in *Cohen* that while witnessing the incident "could have an emotional impact on a child," it did not create a substantial risk to the child's health or safety. *Id.* at ¶ 30.

{¶ 64} In this case, J.L. witnessed her father drag her mother's bloody body down the steps and place it into a vehicle. Her mother's body had two gunshot wounds, one clearly visible on her cheek. She also witnessed her mother's blood on the floor in the home, on the stairs, and on her father's boots. She observed a gun in her father's pocket. She testified that she was scared while these events took place. The trial court indicated the psychological trauma was the main factor in finding that Lynch created a substantial risk to the health and safety of J.L.

{¶ 65} We find that a rational trier of fact could have found that Lynch recklessly created a substantial risk to J.L.'s health or safety by violating of a duty of care, protection, or support. The trial court did not err when it overruled Lynch's Crim.R. 29 motion for acquittal on Count 9, child endangering.

## H. Count 11, Gross Abuse of a Human Corpse

{¶ 66} Lynch next argues that the trial court erred when it did not grant his Crim.R. 29 motion on Count 11, gross abuse of a human corpse, in violation of R.C. 2927.01(B). He argues that the State had to prove that he treated a human corpse in a way that would outrage reasonable community sensibilities.

{¶ 67} Lynch was convicted of gross abuse of a corpse in violation of R.C. 2927.01(B), which provides that "no person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." R.C. 2927.01(B). J.L. testified that Lynch dragged Jovon down the steps and placed her in the Infiniti. He then drove away in Jovon's vehicle, leaving Jovon in the Infiniti to be found by neighbors. Photographs admitted into evidence show Jovon's

body in the Infiniti with her breasts partially exposed. Lynch's DNA was found on the underarm of the shirt Jovon was wearing when she was found.

{¶ 68} We find that a rational trier of fact could have found that Lynch treated a human corpse in a way that would outrage reasonable community sensibilities. We find that the trial court did not err when it overruled Lynch's Crim.R. 29 motion for acquittal on Count 11, gross abuse of a human corpse.

### I. Three-Year Firearm Specification

{¶ 69} Lynch argues that the trial court erred when it did not grant his Crim.R. 29 motion on the three-year firearm specification on Count 3, which merged with Count 2. He further argues the State had to prove that he had a firearm on or about his person or under his control while committing the various offenses, and that he displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or used it to facilitate the offense.

{¶ 70} As discussed above, J.L. testified that Lynch had a gun in his pocket. In addition, Jovon died from gunshot wounds. We find that a rational trier of fact could have found that Lynch had a firearm on or about his person or under his control while committing the various offenses. The trial court did not err by overruling Lynch's Crim.R. 29 motion for acquittal on the three-year firearm specification attendant to Count 3.

### J. Manifest Weight

{¶ 71} In his fifth assignment of error, Lynch argues that his convictions are against the manifest weight of the evidence.

{¶ 72} When evaluating a manifest weight challenge, we question whether the State met its burden of persuasion. *State v. Hill*, 2013-Ohio-578, ¶ 32 (8th Dist.). We "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 2018-Ohio-1562, ¶ 168, citing *Thompkins*, 78 Ohio St.3d at 387. An appellate court will reverse on manifest weight "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. McLoyd*, 2023-Ohio-4306, ¶ 40 (8th Dist.), quoting *Thompkins* at 387.

{¶ 73} After weighing all the evidence as discussed above, we cannot say that this is one of the rare cases in which the trier of fact lost its way. Lynch's convictions were not against the manifest weight of the evidence, and his fifth assignment of error is overruled.

## K. Jail-Time Credit

{¶ 74} In his sixth assignment of error Lynch argues that the trial court erred when it failed to calculate and award him with jail-time credit as required by law. The State concedes Lynch's sixth assignment of error. Therefore, we reverse and remand and order the trial court to make a factual determination as to the amount of jail-time credit to be awarded to Lynch and to issue an amended journal entry reflecting that finding.

**L. Consecutive Sentences for Firearm Specifications**

{¶ 75} In his seventh and final assignment of error, Lynch argues that the trial court erred when it imposed a consecutive sentence for firearm specifications attendant to Counts 2 and 3 because those counts merged as allied offenses. Lynch raised the issue to preserve it should the Ohio Supreme Court reconsider that position or if the federal courts address the matter.

{¶ 76} R.C. 2929.14(B)(1)(g), provides that

[i]f an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 77} The Ohio Supreme Court has stated that "[b]ecause the plain language of R.C. 2929.14(B)(1)(g) requires that certain offenders receive prison terms for multiple specifications, we hold that imposing separate prison terms for multiple firearm specifications is required in situations like the one in this case." *State v. Bollar*, 2022-Ohio-4370, ¶ 1.

{¶ 78} Pursuant to *Bollar*, Lynch's seventh assignment of error is overruled.

## III. Conclusion

{¶ 79} Lynch's first, second, third, fourth, fifth, and seventh assignments of error are overruled.  We therefore affirm his convictions and sentence.  On his sixth assignment of error, we reverse and remand solely for the trial court to properly calculate jail-time credit.

{¶ 80} Affirmed in part, reversed in part, and remanded for calculation of jail-time credit.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

EMANUELLA D. GROVES, P.J., and
ANITA LASTER MAYS, J., CONCUR