[Cite as *State v. Carpenter*, 2026-Ohio-116.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellee,       :

                       No. 114655

v.                                :

KYLE CARPENTER,                   :

    Defendant-Appellant.      :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
               AND REMANDED
**RELEASED AND JOURNALIZED:** January 15, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-692249-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Tasha L. Forchione, Assistant Prosecuting
Attorney, *for appellee*.

HMW Law and Justin M. Weatherly, *for appellant*.

EMANUELLA D. GROVES, P.J.:

{¶ 1} Defendant-appellant Kyle Carpenter ("Carpenter") appeals his convictions for strangulation, domestic violence, and endangering children

following a bench trial. Upon review, we affirm Carpenter's strangulation and domestic-violence convictions but reverse his endangering-children conviction.

## I. Facts and Procedural History

{¶ 2} In June 2024, Carpenter was indicted in a three-count indictment for offenses allegedly committed in April 2024 against his wife, J.C., and their then 23-month-old son. Count 1 charged Carpenter with strangulation in violation of R.C. 2903.18(B)(3), a fourth-degree felony, with a furthermore clause that the victim was a family or household member. Count 2 charged Carpenter with domestic violence in violation of R.C. 2919.25(A), and Count 3 charged him with endangering children in violation of R.C. 2919.22(A), both first-degree misdemeanors. Carpenter pleaded not guilty and waived his right to a jury trial. The matter proceeded to a week-long bench trial in October 2024.

{¶ 3} Immediately prior to trial, the prosecutor informed the trial court that J.C.'s mother had just provided the State with a cassette-tape recording of a conversation between J.C. and Carpenter. The State noted that the recording, which was "probably two, three minutes in length," was played for the parties in the courtroom prior to the trial judge's entrance. Defense counsel stated:

> We had a chance — we did have a chance to listen to it. Obviously, it hasn't been disclosed in as far as the State being given an opportunity to give us a copy of it, but it is a three-minute recording. And frankly, [the defense team does not] necessarily find it to be particularly — I mean, let's just say it's not a smoking gun, one way or the other, Judge. So if the State plans on introducing it, I am not going to object.

The prosecutor then put the trial court on notice that the State reviewed the defense's discovery and planned to object to the introduction of photographs, text messages, and recordings that it believed to be irrelevant. The defense claimed that these pieces of evidence were "highly relevant" because they "absolutely show" that J.C., not Carpenter, engaged in violent behavior. The defense further claimed that the evidence was "highly pertinent . . . in making a determination . . . as to credibility." The trial court advised that it was "not at this time going to entertain a motion in limine" and noted that the parties were free to make oral objections during the bench trial since a jury was not present.

{¶ 4} After opening statements, the following evidence was presented by the State. First, J.C. offered testimony regarding her relationship with Carpenter and the incident in April 2024 that caused her to call the police. J.C. testified that she "was just trying to . . . have a normal day with the children" but "[Carpenter] was trying to pick a fight with me." J.C. explained, "[H]e would wake up and just hated me, didn't want to be in the same room as me."

{¶ 5} According to J.C., the quarrel became physical later that morning when J.C. was playing with their son and ignoring Carpenter's attempts to argue. J.C. testified that Carpenter was saying "[a] lot of very nasty things, he was telling me how much he hates me. And that's when he started pushing me down on the couch." While Carpenter pushed J.C.'s body, their son was in same room, about six feet away. J.C. repeatedly told Carpenter that their son was watching but Carpenter

did not stop. At one point, Carpenter pushed J.C. down on the couch and kicked her "really hard" in the buttocks while wearing work boots.

{¶ 6} After being kicked, Carpenter pushed J.C. down "about maybe five times" before "reach[ing] down[,] put[ting] his hands around [her] neck[,] and strangl[ing her]" while her back was against the couch. J.C. testified that she knew Carpenter's right hand was around her neck and she believed his left hand was too. J.C. stated, "I couldn't breathe. And I remember thinking, ['O]h, my God, I am going to die.['] Like, you know, you have that moment where . . . my life flashed before my eyes."

{¶ 7} J.C. "came to" and saw their son in the background. J.C. testified, "[H]e was crying, he was screaming, he was so scared." Once J.C. was able to stand, she grabbed their son, took him to his room, and "got him situated." J.C. explained that she eventually set up an iPad for their son to watch "to get him away from everything that just happened."

{¶ 8} After the incident, Carpenter followed J.C. around the house and told her that they needed to sit down and talk or "it's going to get really bad again." J.C. testified that she could not believe what happened, was shaking, and could not look at Carpenter while she sat in silence across from him. Eventually, Carpenter left for work. Carpenter sent J.C. text messages, which she did not respond to, and threatened to shut off her cell phone, which he ultimately did.

{¶ 9} J.C. testified that she did not call the police that day because she was "so scared of what else [Carpenter] could do to [her] at that point." However, J.C.

did speak to her mother a couple of times. After Carpenter shut off her cell phone, J.C. also sent an email to her mother and mother-in-law to let them know that she had no way of calling 9-1-1. J.C. explained that Carpenter must have turned her cell phone back on shortly thereafter because she was able to call her mother again and tell her that she was strangled by Carpenter in front of their son. Carpenter came home from work and was very upset that J.C. was talking to her mother. The cassette-tape recording was played for the trial court.[1] As the recording played, J.C. identified the voices of J.C., Carpenter, and J.C.'s mother. No objections were raised by the defense.

{¶ 10} After the telephone call, J.C. went to her mother's house. J.C.'s mother took photographs that evening, which depicted lines on J.C.'s neck. In addition to her visible injuries, J.C. testified that swallowing hurt. The next day, J.C. also took a photograph of the bruise on her buttocks from Carpenter's kick.

{¶ 11} J.C. also offered testimony about text messages exchanged between her and Carpenter a couple of days after the altercation. J.C. explained that Carpenter asked to see a photograph of the bruise on her buttocks. After seeing the photograph, J.C. testified that Carpenter expressed that it was "incredibly sad." According to J.C., Carpenter stated, "I hate that you probably have so many pictures

---

[1] Based on our review of the exhibits in this court's record, the cassette-tape recording was over six minutes long. The recording's length was not objected to or discussed on the record when the recording was first played in open court. The transcripts later reveal that the device's "counter" may have been inaccurate.

in your phone of all of it" and apologized "for everything we have ever ran into as a couple . . . ."

{¶ 12} J.C. reported the incident to police in May 2024, almost a month after its occurrence. J.C. explained that she did not contact the police sooner "[b]ecause [she] was absolutely scared of [Carpenter] and what he was going to do to me." To ensure her safety in the interim, J.C. lived with her mother and retained a lawyer. J.C. stated, "I think I got to the point where I felt safe enough to go to the police, that he couldn't come do anything to me at that point."

{¶ 13} On cross-examination, J.C. testified that "there was always a fear with [Carpenter]" and she was "very, very stuck in [a cycle of abuse]" that began in 2021. The defense questioned J.C. about the recorded call with her mother, replaying it and disagreeing about whether Carpenter can be heard saying "yeah right" or "yeah what about it" in response to J.C. telling her mother that Carpenter's hands were around her neck and she could not breathe. The defense also played multiple audio and video recordings taken by Carpenter, questioning whether J.C. feared or was abused by Carpenter based on what could be heard during their recorded interactions. Multiple objections were raised by the State during this line of questioning. J.C. repeatedly testified that she feared Carpenter and was traumatized by him. J.C. also disagreed with the defense's characterization of Carpenter's "staged" recordings taken at "selective" times.

{¶ 14} The defense then referred to text messages and transcripts from a different proceeding to impeach Carpenter with purportedly inconsistent prior

statements. The defense also questioned J.C. about the temporary protection order that prohibited Carpenter from seeing his children and her potential motivations related to divorce proceedings and custody battles. The State continued to object, challenging the evidence's relevance to the events that transpired in April 2024 and distinguishing motive from credibility.

{¶ 15} Finally, the defense confronted J.C. with photographs of marks on the back of her neck, suggesting that they were caused by her own rubbing or scratching. J.C. did not know what caused the marks or where the pictures came from. The defense also questioned J.C. about numerous photographs of Carpenter with marks on his chest, shoulders, arms, midsection, and face. J.C. did not recall how Carpenter sustained those injuries or ever seeing them. In one instance, J.C. was shown a photograph of Carpenter with a torn shirt, which J.C. admitted that she ripped.

{¶ 16} Next, J.C.'s mother offered testimony regarding her daughter's relationship with Carpenter and her involvement following the April 2024 incident. J.C.'s mother testified that she received two telephone calls from J.C. that morning. J.C. sounded "very upset, scared, and worried" during the latter call. J.C.'s mother received another call around dinnertime during which her daughter was "getting pretty distraught" and "sounded terrified." J.C.'s mother explained, "[J.C.] was very worried because they were arguing and she didn't know what to do. She was getting scared." J.C.'s mother heard Carpenter "yelling . . . [a]nd calling her names and just screaming" in the background. J.C.'s mother began recording the call with an old

recorder because she was "becoming very alarmed" by "how scary he was sounding; how angry he sounded."

{¶ 17}  When the State began to reintroduce the cassette-tape recording that was previously played during J.C.'s testimony and cross-examination, the defense objected, stating, "We have never been given a copy of this.  So it's played — part of it was played before we started trial and then I believe the whole thing was played.  We don't know.  [The State is] playing snippets from it.  We don't have this recording.  I mean, we got it yesterday when we started trial."  The trial court recalled that the defense never objected to the recording's admissibility when it was initially played.  The defense explained:

> [W]e didn't object to it at the beginning because obviously it's older technology.  So they did play it for us.  But I will say the part that was played for us prior to trial wasn't the part that was played during trial.  So that took us by a little bit of surprise.  What we were expecting to hear during trial wasn't what we heard prior to the proceedings.  That's why we didn't object.

The State responded, explaining that it received the cassette-tape recording from J.C.'s mother the morning of trial; the cassette tape was made available to the defense; and, despite opportunity for inspection, the defense did not request to inspect or listen to it.  The trial court allowed the State to continue questioning J.C.'s mother about the recording and advised that it should be digitized, if possible, prior to cross-examination.  When J.C.'s mother's testimony resumed, she testified that she made the recording of the couple's argument in April 2024 and that it was a fair

and accurate representation of what she heard that evening while on the phone with her daughter.

{¶ 18} J.C.'s mother went to the Carpenter's house to pick up J.C. after receiving another call from her daughter. They went directly back to J.C.'s mother's home, where she took pictures of the marks on J.C.'s neck using her phone. J.C.'s mother identified the photographs she took to "document[] the marks on [J.C.'s] neck." J.C.'s mother helped her daughter prepare documents to give to the police and supported her throughout the process.

{¶ 19} On cross-examination, J.C.'s mother was questioned about numerous text messages between her, Carpenter, and Carpenter's parents and photographs of Carpenter's injuries. J.C.'s mother did not recall the text messages or photographs and testified that she did not believe her daughter had anger problems. Nor did J.C.'s mother know the cause of Carpenter's injuries. J.C.'s mother testified that she never saw J.C. abuse Carpenter during their relationship.

{¶ 20} J.C.'s mother was also questioned about the cassette-tape recording, which had been digitized and provided to the defense. J.C.'s mother testified that she did not provide the recording to police with the documents she helped her daughter compile because she had never been through this process and never thought about it. J.C.'s mother did not have any explanation as to why the recording was not given to the prosecution before the day of trial.

{¶ 21} J.C.'s mother was asked why she did not call the police after the April 2024 incident if she believed J.C. had been choked and strangled. J.C.'s mother

explained: "It was not my place to make that call. And at that moment we were very scared and upset and shook. [J.C.] was exhausted. She was absolutely terrified. [Carpenter] continued to try to get in touch with her. It was scary. We didn't know what to do . . . ." She later testified, "I didn't call the police because my daughter was petrified. And it was her situation. I wanted her to be the lead, but she was petrified to make any move at all."

{¶ 22} Finally, J.C.'s mother testified that J.C. "[a]bsolutely never" scratched her own neck when she was stressed or upset. J.C.'s mother did not recall ever seeing her daughter exhibit that behavior or J.C. ever mentioning it.

{¶ 23} Next, MetroHealth forensic unit manager and forensic nurse Anna Becks ("Becks") offered testimony about the physiology of strangulation and its physical and psychological effects. Becks testified that pain is often a short-term effect of strangulation, but about 50 percent of victims do not exhibit visible signs that a strangulation occurred. Becks explained that bruising and strangulation marks may not always be present "because it really doesn't take that much pressure." However, if pressure was applied long and hard enough, marks could be visible as early as a couple of hours after the strangulation occurred or appear up to three to four days later. Becks also explained another physical effect sometimes caused by strangulation: petechiae, or "little pinpoint dots" from vessels popping above the point of pressure. On cross-examination, Becks explained that the immediate results of pressure from strangulation are usually redness and swelling that later turns into bruising.

{¶ 24} Becks also offered testimony about domestic abuse based on her experience and training. Becks approximated the following statistics from working with victims: almost 90 percent of the time there was a delay between an act of physical abuse and disclosure; nearly 80 percent of victims experienced multiple instances of violence but only reported one; and about 50 to 60 percent of victims felt shame, guilt, and fear. Becks then offered testimony about cycles of violence built on power and control from financial, emotional, and physical abuse. Becks explained that victims often do not immediately understand the impact of the violence perpetrated against them but "[e]ventually everybody has their breaking point." Becks testified, "Every victim that has finally reported it has said to me, '[O]h, my God, I thought he was going to kill me.' And that's usually the point of when they're finally in my emergency room talking to me and we are helping them exit the lifestyle." Becks further testified that is not unusual for a victim of domestic violence or strangulation to continue to have a relationship with the perpetrator, noting, "I see it all the time sadly." Becks also testified that it is common for victims to minimize or deny violence or abuse and hide their experiences from the people closest to them.

{¶ 25} At the conclusion of Becks' testimony, the State rested and admitted the following exhibits without objection: the cassette-tape recording of J.C.'s conversation with her mother; two photographs of the lines on J.C.'s neck; one photograph of the bruising on her buttocks; and the text messages between J.C. and

Carpenter. The defense moved for acquittal under Crim.R. 29, which the trial court denied.

{¶ 26} The defense then presented their case, calling Carpenter's mother and stepfather as witnesses. Carpenter's mother testified that she was never aware of Carpenter becoming violent in prior relationships. She believed Carpenter was a "gentle giant" and J.C. had an "explosive temper." Carpenter's stepfather testified that he did not believe Carpenter had anger issues; rather, he believed that J.C. did and described her behavior as "random." Carpenter's stepfather explained, "There was everything from anger, hysteria, to loving, happy. And everything in between."

{¶ 27} Carpenter's mother offered testimony about Carpenter's "tumultuous" relationship with J.C. and her communications with Carpenter, J.C., and J.C.'s mother regarding the couple's struggles. Carpenter's mother testified that she heard yelling, screaming, fighting that turned physically violent, and J.C. spitting on Carpenter during telephone calls. Carpenter's stepfather also heard screaming, yelling, and things being thrown over the telephone. Carpenter's mother and stepfather saw photographs taken by Carpenter of injuries they believed he sustained from J.C. They never saw any similar photographs of J.C. Carpenter's mother testified that she told her son to record his interactions with J.C. to protect himself because she was worried authorities were going to be called. Carpenter's stepfather told Carpenter not to delete anything from his phone.

{¶ 28} Both Carpenter's mother and stepfather offered testimony regarding various text-message and telephone conversations they had with J.C. and her

mother, impeaching their prior testimony. Carpenter's mother testified that she believed Carpenter was abused by J.C. based on her conversations with Carpenter, J.C., and J.C.'s mother and they never had any discussions about Carpenter abusing J.C. Carpenter's stepfather testified that he had no reason to believe Carpenter was causing injuries to J.C.; rather, he believed the reverse to be true. Carpenter's mother was not concerned that J.C. was a victim of violence because Carpenter was "not a violent person." Nor did she have any reason to believe that Carpenter strangled J.C. in April 2024.

{¶ 29} Finally, Carpenter testified on his own behalf. Carpenter described his relationship with J.C., explaining that it became "loud," "very intense," and "a terrible situation to be in." Carpenter testified that they engaged in frequent arguments and acknowledged that he was "not at all" perfect, admitting that he sometimes got upset, yelled, and screamed. However, Carpenter testified that he never struck, hit, or strangled J.C. Carpenter further testified that he was never violent, controlling, or abusive with J.C. and never did anything to cause her physical harm. Rather, Carpenter claimed that J.C. was violent with him, beginning in November 2021, worsening as time passed, and continuing until he was charged. Carpenter claimed that J.C. spit on him; stomped on his toes; and bit, scratched, and hit him countless times, often leaving marks. Carpenter further claimed that J.C. screamed at and demeaned him.

{¶ 30} According to Carpenter, he began recording certain interactions with J.C. after she "had a very bad anger spurt." He also started recording J.C. "to be

safe" in the event of a divorce and custody battle. Carpenter testified that he did not report any incidents to police because he believed they could work through it, he did not want to get J.C. in trouble, and he felt ashamed.

{¶ 31} Carpenter offered testimony about numerous audio and video recordings that he took during interactions with J.C.; text messages between him, J.C., and J.C.'s mother; and several self-portrait photographs, depicting various cuts, scrapes, and marks on his face and body and a ripped shirt. Carpenter testified that J.C. was often physically and violently abusive toward him and he was never physically or violently abusive toward her. Carpenter also offered testimony about photographs he took of J.C.'s neck. Carpenter explained that J.C. would grab and rub her neck when she was anxious and tense, "leav[ing] marks that [were] very telling." Carpenter took the photographs because he was scared by the behavior and was worried "what people would think that was."

{¶ 32} Carpenter also described his version of the events that transpired in April 2024. Carpenter testified that he and J.C. argued all day: "It was an intense day. It started bad, was bad, ended bad." Carpenter stated that J.C. was "extremely loud" and "in [his] face." According to Carpenter, J.C. spit at, shoved, hit, slapped, punched, and scratched him. Carpenter testified that he wrapped his arms around J.C.'s body to stop her attack. Carpenter "removed [J.C.] off of [him]" and "moved her away" after she bit him, explaining, "I turned her around and I lifted my foot and I pushed her with my foot." Carpenter testified that his hands never touched J.C.'s neck; his arms were around her shoulders, and his hands were around her back.

Carpenter stated that J.C.'s allegations were false, denying that he choked or strangled her with both of his hands. Carpenter further testified that he was not attempting to cause physical harm to J.C. or prevent her from breathing. Rather, he was attempting to stop J.C. from harming him. Carpenter testified that the confrontation ended after they both calmed down.

{¶ 33} Carpenter acknowledged that his son was in the room when the April 2024 altercation occurred. However, Carpenter testified that J.C. was not holding or touching their son at the time of the altercation; rather, he was eight- to ten-feet away. Carpenter testified that his son, who cried often as a nearly two-year-old child, was never touched during the incident or in any physical jeopardy or pain.

{¶ 34} Carpenter listened to the cassette-tape recording and offered testimony as it was played. According to Carpenter, he and J.C. were simultaneously having conversations that could not be heard and "an entire huge storyline [was] not included." Carpenter did not know he was being recorded. Carpenter testified that he never saw any lines on J.C.'s neck, denied that he caused them, and believed they were self-inflicted. Carpenter also believed that the bruise on J.C.'s buttocks was caused by her own actions.

{¶ 35} On cross-examination, Carpenter was questioned about his family life, failed prior relationships, mental health, work history, cannabis-use disorder, sports betting, and control over when the audio and video recordings he took started and ended. The State also impeached Carpenter with new text messages that J.C. provided to the State during his testimony, suggesting that Carpenter was abusive

and controlling. The defense objected, claiming that the messages were not produced in discovery. After hearing arguments, the trial court allowed the State to question Carpenter based on the new text messages and provided the following reminder to the parties: "I will say something that I have been saying since this trial started, . . . this is a bench trial. There is no jury, and the Court knows how to give these documents the appropriate weight." Ultimately, Carpenter admitted that some of the text messages he sent to J.C. were verbally abusive.

{¶ 36} Carpenter also admitted that the cassette-tape recording was a fair and accurate description of what occurred in the moments following the April 2024 altercation. Carpenter acknowledged that he said "yeah what about it" when J.C. told her mother that she had been strangled but claimed that the comment was made in response to something else. Carpenter testified that he wanted the trial court to believe that he was the victim and maintained that he did not strangle J.C. in April 2024, an allegation he repeatedly denied in recordings and text messages after the incident.

{¶ 37} Following Carpenter's testimony, the defense rested and renewed its Crim.R. 29 motion for acquittal, which was again denied by the trial court. The defense admitted the following exhibits over the State's objection and, according to the trial court, "with the understanding that the Court is able to give all exhibits the proper weight": 13 text message threads between the witnesses, 23 photographs of Carpenter's injuries, two photographs of J.C.'s purported self-inflicted neck injuries, and eight audio and two video recordings taken by Carpenter. Eleven additional

photographs of injuries sustained by Carpenter after the April 2024 incident were also proffered by the defense.

{¶ 38} After hearing closing arguments and deliberating, the trial court found Carpenter guilty of all three counts. Prior to sentencing, Carpenter filed a sentencing memorandum and a contested motion for a new trial. Therein, Carpenter argued that the verdict was not supported by sufficient evidence and an error of law occurred at trial. Referring to conflicting evidence and testimony, Carpenter claimed that the State failed to prove the elements of each of the three charges filed against him. While Carpenter argued that the verdicts should be modified and he should be found not guilty on all three counts, he focused his argument on the endangering-children count. Carpenter cited caselaw and asserted that his son's mere presence during the altercation did not create a substantial risk to his health or safety. Carpenter also sought leave to file a supplemental motion to address the strangulation and domestic-violence counts more fully.

{¶ 39} The trial court subsequently held a hearing on Carpenter's motion for a new trial. After listening to the parties' arguments, the trial court denied Carpenter's motion and proceeded to sentencing. The trial court heard from J.C., J.C.'s mother, the State, defense counsel, and Carpenter and considered Carpenter's presentence-investigation report and sentencing memorandum. The trial court then addressed Carpenter and the family present in court, noting some of its observations:

One thing I remember thinking to myself during the trial is that for those who weren't really paying attention, they'd probably believe it was [J.C.'s] trial and not yours. And I sat through a lot of evidence and testimony and tapes — and I gave your attorneys wide berth in playing that stuff, and I know I made the right decision doing it — about how maybe she was aggravating the situation. And I believe in some cases, she probably was. As you and your lawyers said, it was a toxic relationship. Nonetheless, you were the one that was on trial for what you did [i]n April . . . . You know what you did.

. . .

I will say, based on my observation, I think, respectfully to Mr. Carpenter, he's as scared today as perhaps [J.C.] was when she bravely testified and sat only a few feet away from me, something that I gave a lot of credit to and her demeanor and credibility for purposes of this case.

Ultimately, the trial court imposed a suspended 18-month prison sentence on Count 1 (strangulation) and 2 years of active probation. The trial then imposed a 45-day jail sanction for each of the three counts, running them concurrently.

{¶ 40} Carpenter appeals, raising three assignments of error for review.

**Assignment of Error No. 1**

The guilty verdict[s were] not supported by legally sufficient evidence as a matter of law.

**Assignment of Error No. 2**

The manifest weight of the evidence does not support [Carpenter's] conviction[s].

**Assignment of Error No. 3**

The State's discovery violation deprived [Carpenter] of a fair trial in violation of Crim.R. 16 and his constitutional rights to due process.

## II.    Law and Analysis

## A. Sufficiency and Manifest Weight of the Evidence

{¶ 41} For ease of analysis, we address Carpenter's first and second assignments of error together. In his first assignment of error, Carpenter challenges the sufficiency of the evidence, claiming that the State failed to prove each element for each of the counts brought against him beyond a reasonable doubt. In his second assignment of error, Carpenter argues that his convictions were against the manifest weight of the evidence.

{¶ 42} Sufficiency of the evidence and manifest weight of the evidence are two distinct concepts: "'sufficiency is a test of adequacy'" while manifest weight depends on the evidence's "'"effect in inducing belief'."'" (Emphasis deleted.) *In re Z.C.*, 2023-Ohio-4703, ¶ 13, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990).

{¶ 43} A challenge to the sufficiency of the evidence supporting a conviction requires a reviewing court to determine whether the State has met its burden of production at trial. *Thompkins* at 390. When reviewing a sufficiency challenge, an appellate court "examine[s] the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier-of-fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 44} During its review for sufficiency of the evidence, an appellate court does not assess whether the State's evidence is to be believed, "but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins* at 390. Indeed, when evaluating evidence's sufficiency, a reviewing court does not contemplate witness credibility or weigh the evidence; rather, "the reviewing court assumes that witnesses testified truthfully and evaluates whether that testimony, along with any other direct or circumstantial evidence presented at trial, satisfies each element of the offense." *State v. Haskins*, 2024-Ohio-5908, ¶ 37 (8th Dist.), citing *State v. Young*, 2022-Ohio-3132, ¶ 47 (8th Dist.), and *Cleveland v. Clark*, 2024-Ohio-4491, ¶ 37, 39 (8th Dist.) (noting that a challenge to the sufficiency of the evidence presents a question of law, not fact).

{¶ 45} "But 'even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re Z.C.*, 2023-Ohio-4703 at ¶ 14, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12. Unlike a sufficiency challenge, which questions whether the State has met its burden of production, a manifest-weight challenge questions whether the State has met its burden of persuasion. *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.), citing *Thompkins,* 78 Ohio St.3d 380 at 390.

{¶ 46} In a manifest-weight review of a bench-trial verdict — where the trial court serves as the factfinder in lieu of a jury — an appellate court will not reverse a conviction so long as the trial court could reasonably conclude from substantial

evidence that the State proved the offense beyond a reasonable doubt. *State v. Hughes-Davis*, 2025-Ohio-3151, ¶ 25 (8th Dist.), citing *State v. Crenshaw*, 2020-Ohio-4922, ¶ 23 (8th Dist.), and *State v. Worship*, 2022-Ohio-52, ¶ 34 (12th Dist.). In assessing whether a bench-trial verdict is against the manifest weight of the evidence, this court is guided by the following well-settled standard:

> [T]o warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*Crenshaw* at *id.*, quoting *State v. Bell*, 2019-Ohio-340, ¶ 41 (8th Dist.), citing *State v. Strickland*, 2009-Ohio-3906, ¶ 25 (8th Dist.).

{¶ 47} The Ohio Supreme Court has repeatedly held that "[a] manifest-weight challenge should be sustained "'only in the exceptional case in which the evidence weighs heavily against the conviction.'"" *State v. Nicholson*, 2024-Ohio-604, ¶ 71, quoting *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983); *State v. Hundley*, 2020-Ohio-3775, ¶ 80. "'[A] defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial.'" *State v. Kilton*, 2019-Ohio-87, ¶ 20, quoting *State v. Mossburg*, 2013-Ohio-1664, ¶ 22 (8th Dist.). Nor is a conviction against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over the defendant's. *State v. Wells*, 2021-Ohio-2585, ¶ 40 (8th Dist.), citing *State v. Williams*, 2018-Ohio-3368, ¶ 67 (8th Dist.).

{¶ 48} With these concepts in mind, we review Carpenter's convictions for strangulation, domestic violence, and endangering children to determine 1) whether sufficient evidence was presented and 2) whether the convictions were against the manifest weight of the evidence.

### 1. Strangulation

{¶ 49} Carpenter was convicted of strangulation in violation of R.C. 2903.18(B)(3), which provides: "No person shall knowingly . . . [c]ause or create a substantial risk of physical harm to another by means of strangulation or suffocation." The elements of R.C. 2903.18(B)(3) are statutorily defined, and several of those definitions also inform our review of Carpenter's domestic-violence and endangering-children convictions.

{¶ 50} We begin with R.C. 2901.22(B), which establishes how and when a person acts "knowingly":

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

Notably, the definition of "knowingly" does not require that a person act with "'specific intent to cause a certain result.'" *State v. Jackson*, 2012-Ohio-4278, ¶ 28 (8th Dist.), quoting *State v. Dixon*, 2004-Ohio-2406, ¶ 16 (8th Dist.). Rather, "'[t]o be actionable it is only necessary that the result is within the natural and logical

scope of risk created by the conduct.'" (Cleaned up.) *State v. Lloyd*, 2021-Ohio-1808, ¶ 51 (8th Dist.), quoting *State v. Hampton*, 2016-Ohio-5321, ¶ 13 (8th Dist.). Absent a defendant's own admission, whether an act is committed "knowingly" can only be determined "'from all the surrounding facts and circumstances, including the doing of the act itself.'" *Id.*, quoting *Dixon* at ¶ 16; *State v. Ashley*, 2017-Ohio-188, ¶ 26 (8th Dist.) ("Whether a defendant acted "knowingly" must be inferred from the totality of the circumstances surrounding the alleged offense.").

{¶ 51} Next, we turn to R.C. 2901.01(A), which contains the definitions for "substantial risk" and "physical harm to persons." "Substantial risk" is defined as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "Physical harm to persons" is defined as "any injury, illness, or other physical impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 52} Finally, R.C. 2903.18(A)(1) defines "strangulation or suffocation" as "any act that impedes the normal breathing or circulation of the blood by applying pressure to the throat or neck, or by covering the nose and mouth."

{¶ 53} Carpenter challenges his strangulation conviction on two fronts. First, Carpenter argues that the State failed to offer any mens-rea evidence. Carpenter claims that there is nothing in the record to suggest that he knew or should have known that his actions — which were purportedly taken "to escape [J.C.'s] aggression" and "end the pain" — would cause or create a substantial risk of

physical harm.  Second, Carpenter argues that the State failed to prove that he strangled J.C., citing photographs of J.C.'s self-inflicted neck injuries.  Carpenter asserts that this evidence "calls into question the credibility of any claim that the injuries in this case were caused by strangulation" and "demonstrates a history of self-inflicted harm that could account for similar physical signs."

{¶ 54} After thorough review of relevant caselaw and the record before us, we find that Carpenter's strangulation conviction is supported by sufficient evidence.  J.C. testified that Carpenter pushed her down, put his hands around her neck, and strangled her.  J.C. further testified that she could not breathe, believed she was going to die, saw her life flash before her eyes, and eventually "came to." J.C.'s mother noticed marks on J.C.'s neck and took photographs of the small, red lines or dots that evening.  Becks offered testimony that bruising and petechiae, or "little pinpoint dots" from vessels popping above the point of pressure, can be caused by strangulation.  Carpenter can also be heard in the cassette-tape recording saying "yeah what about it" in response to J.C. telling her mother that his hands were around her neck and she could not breathe.

{¶ 55} After viewing the evidence against Carpenter in a light most favorable to the State, we find that the trial court could reasonably conclude from substantial evidence that the State proved beyond a reasonable doubt that he knowingly caused or created a substantial risk of physical harm to J.C. by means of strangulation or suffocation.  Contrary to Carpenter's arguments, the State presented mens-rea evidence that Carpenter put his hands around J.C.'s neck,

preventing her from breathing.  The State was not required to prove that Carpenter specifically intended to strangle J.C.  Nor do we assess J.C.'s credibility or determine whether the State's evidence is to be believed in a sufficiency analysis.  Instead, we ask whether, if believed, the evidence against Carpenter would support his conviction.  Undoubtedly, it is within the natural and logical scope of risk that putting one's hands around another's neck could result in strangulation, or the impeding of normal breathing or circulation of the blood by applying pressure to the throat or neck.  Thus, we find that Carpenter's strangulation conviction is supported by sufficient evidence.

{¶ 56} Moreover, we cannot say that this is the exceptional case where the evidence weighs heavily against Carpenter's conviction for strangulation.  We acknowledge Carpenter's testimony that he never touched J.C.'s neck during the altercation in April 2024.  We further acknowledge that Carpenter proposed alternative theories for the cause of J.C.'s injuries and offered evidence suggesting that they may have been self-inflicted.  However, after weighing the evidence and all reasonable inferences and considering the credibility of witnesses, we find that the trial court did not clearly lose its way in resolving conflicts or create a manifest miscarriage of justice based on the record before us.

{¶ 57} Even without consideration of Carpenter's comment in the cassette-tape recording, J.C.'s testimony was corroborated by photographs taken by her mother on the night of the incident and Becks' testimony describing the potential physical effects caused by strangulation.  Carpenter is not entitled to a reversal on

manifest-weight grounds merely because inconsistent evidence was presented at trial. Nor is Carpenter entitled to reversal because the trier of fact chose to believe the State's version of events over his. Indeed, the trial court could reasonably conclude from substantial evidence that J.C. was strangled by Carpenter in April 2024. Thus, Carpenter's strangulation conviction was not against the manifest weight of the evidence.

{¶ 58} Accordingly, we overrule Carpenter's first and second assignments of error as they relate to his strangulation conviction.

### 2. Domestic Violence

{¶ 59} Carpenter was also convicted of domestic violence in violation of R.C. 2919.25(A), which provides: "No person shall knowingly cause or attempt to cause physical harm to a family or household member."

{¶ 60} Carpenter again challenges the statute's mens-rea component, arguing that none of the evidence suggests that he knew or should have known that his actions would likely cause J.C. physical harm. Carpenter claims that he made multiple attempts to defuse the situation before resorting to nonexcessive physical force. Carpenter further claims that his response was limited to what was reasonably necessary to remove himself from the immediate threat posed by J.C. Carpenter also asserts that it is impossible to determine causation beyond a reasonable doubt given "the question of the actual cause of any injuries" allegedly sustained by his wife.

{¶ 61} After careful consideration of the record before us, we find that Carpenter's domestic-violence conviction is supported by sufficient evidence. J.C. testified that Carpenter pushed her down, kicked her buttocks "really hard" while wearing work boots, and continued to push her multiple times before strangling her. Photographs of J.C. injuries were admitted into evidence, including one photograph depicting dark bruising on her buttocks.

{¶ 62} Viewing the evidence against Carpenter in a light most favorable to the State, we conclude that the trial court could reasonably find that Carpenter knowingly caused or attempted to cause physical harm to J.C. Certainly, there is a high probability that repeated pushing and a "really hard" kick to the buttocks with work boots will cause injury, and any resulting injury — regardless of its gravity — is a natural and logical risk created by that conduct. Thus, the trial court could reasonably conclude from the evidence that the State proved the offense beyond a reasonable doubt.

{¶ 63} Moreover, this is not the exceptional case where the evidence weighs heavily against Carpenter's conviction for domestic violence. After thoroughly reviewing the record before us, we cannot conclude that the trial court clearly lost its way in resolving conflicts in the evidence. Nor did the trial court create a manifest miscarriage of justice when it convicted Carpenter of domestic violence.

{¶ 64} As detailed in this court's statement of facts, the trial court afforded the defense considerably wide latitude to present their theory of the case — that J.C., rather than Carpenter, was the aggressor in their relationship; Carpenter merely

attempted to stop J.C. from attacking him in April 2024; and J.C. orchestrated Carpenter's charges to gain an advantage in divorce and custody proceedings. The record reveals that this evidence was considered by the trial court and weighed against the evidence presented by the State. Indeed, the trial court noted that the couple was involved in a "toxic relationship" and J.C. — whose testimony was given "a lot of credit" — may have aggravated the situation in some instances. However, the trial court acknowledged J.C.'s demeanor and credibility while she "bravely testified" and ultimately concluded that Carpenter was "the one that was on trial for what [he] did" in April 2024.

{¶ 65} Again, Carpenter is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial or because the trier of fact chose to believe the State's version of events over his. Thus, we cannot say that Carpenter's domestic-violence conviction is against the manifest weight of the evidence.

{¶ 66} Accordingly, we overrule Carpenter's first and second assignments of error as they relate to his domestic-violence conviction.

### 3. Endangering Children

{¶ 67} Finally, Carpenter was convicted of endangering children in violation of R.C. 2919.22(A), which provides, in relevant part: "No person, who is the parent . . . of a child under eighteen years of age . . . shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." This court has held:

> A child-endangering conviction may be based upon isolated incidents or even a single rash decision in which a parent recklessly puts his or her child's health or safety at risk. However, to prove the requisite "substantial risk" element, there must be some evidence beyond mere speculation as to the risk of harm that could potentially occur due to a single imprudent act.

(Cleaned up.) *Cleveland Hts. v. Cohen*, 2015-Ohio-1636, ¶ 27 (8th Dist.).

{¶ 68} Carpenter acknowledges that his then 23-month-old son was present and in the same room when the alleged incident occurred. However, Carpenter argues that the State failed to prove that he violated any duty or created any substantial risk to his son's health or safety. Carpenter claims that his son was not involved nor placed in any immediate danger, arguing that witnessing an incident is insufficient to support an endangering-children conviction. Carpenter further claims that the State relied solely on his son's crying to establish that he created a substantial risk to his child's physical health or safety — a reaction that is "hardly uncommon or conclusive in the context of a toddler reacting to a loud or stressful environment." Finally, Carpenter argues that his son's young age rendered him "less capable of understanding or processing the alleged incident, making any risk [to his mental health or safety] even more remote."

{¶ 69} The State counters that Carpenter and J.C.'s son was only six-feet away from his father's violent assault of his mother. The State asserts that J.C. repeatedly warned Carpenter that their son was watching as he continued to shove, kick, and strangle her. The State further counters that Carpenter's argument that crying is common for toddlers and not indicative of substantial risk "ignores the

context of the incident — a sudden and traumatic exposure to domestic violence by a primary caregiver." The State argues that the severity of the assault and the child's immediate emotional reaction support the trial court's finding that Carpenter's conduct posed a substantial risk to his son's emotional well-being.

{¶ 70} Based on our review of the relevant caselaw, we note that our sufficiency-of-the-evidence analyses for endangering-children convictions are incredibly fact specific and determined on case-by-case bases. For example, in *Cohen*, 2015-Ohio-1636, at ¶ 29 (8th Dist.), two children testified that they witnessed their father pushing their mother multiple times during an ongoing and heated argument. As a result of the attack, the children's mother sustained lacerations and/or abrasions to her forehead and nose and suffered from "substantial swelling." *Id.* at ¶ 12. Other than their observations, the children were not in any way part of the altercation involving their parents. *Id.* at ¶ 29. We held that the evidence presented was insufficient to support Cohen's endangering-children conviction, explaining:

> Although we have little doubt that (1) hearing one's parents argue about getting a divorce and leaving the family's home and (2) viewing the type of inappropriate and irresponsible behavior exhibited by the parents in this case could have an emotional impact on a child, we cannot say, based on the record before us, that the city met its burden of proof. Simply because the two children were present in the home at the time of the altercation, may have witnessed part of the dispute and may have been (understandably) upset or confused by their parents' words and actions does not establish that Cohen violated a duty of care, protection[,] or support to his children or that he, with heedless indifference to the consequences of his actions, perversely disregarded a known risk and thereby created a substantial risk to the health or safety of his children.

*Id.* at ¶ 30.

{¶ 71} Similarly, in *State v. Jackson-Williams*, 2020-Ohio-1118, ¶ 30 (8th Dist.), it was undisputed that Jackson-Williams assaulted his children's mother in their presence. The children were inside a vehicle while Jackson-Williams was assaulting their mother outside. *Id.* This court found no evidence that Jackson-Williams' aggressive behavior toward the children's mother created a substantial risk to their health and safety since the children were safely secured inside a vehicle. *Id.* at ¶ 35. We explained, "Although witnessing their parents fight probably had a negative emotional impact on the children, their mere presence at the scene of their parents' domestic dispute did not create a substantial risk to their health or safety." *Id.*

{¶ 72} Alternatively, in *State v. Kouame*, 2020-Ohio-3118, ¶ 23 (8th Dist.), this court upheld Kouame's endangering-children convictions after finding that his three children were actively involved — and not merely present — in the altercation. There, the middle child became involved in the altercation after Kouame choked and punched her mother inside a bedroom. *Id.* at ¶ 24. The middle child entered the bedroom to ask if her mother was okay and was handed the youngest child, who was in the bedroom, being passed between the parties, and crying. *Id.* at ¶ 24-25. Kouame acted aggressively toward the middle child as she held the youngest child. *Id.* at ¶ 26. The oldest child became involved in the physical altercation after he heard his mother calling out for him inside the bedroom. *Id.* at ¶ 27. He broke down the door out of fear for her safety and observed his mother's head bleeding. *Id.* at

¶ 27-28. Both the oldest and middle child began recording the altercation and considered calling 9-1-1 as it escalated. *Id.* at ¶ 38. Accordingly, we found that the children were not merely bystanders or witnesses to the physical altercation. *Id.* at ¶ 29. Based on the children's involvement and participation, we concluded that the State's evidence established that Kouame's actions created a substantial risk of harm to their physical and mental or emotional health and safety. *Id.* at ¶ 35.

{¶ 73} Finally, in *State v. Lynch*, 2025-Ohio-2769, ¶ 64 (8th Dist.), a child witnessed Lynch, her father, drag her mother's bloody body down steps and place her mother into a vehicle. The child's mother sustained two bullet wounds, one of which was clearly visible. *Id.* The child also observed her mother's blood on the floor in the home, on the stairs, and on her father's boots and a gun in her father's pocket. *Id.* The child testified that she was scared while these events took place. *Id.* The trial court indicated that psychological trauma was the main factor supporting its finding that Lynch created a substantial risk to the health and safety of his child. *Id.* In affirming the trial court's denial of Lynch's Crim.R. 29 motion for acquittal, this court found that a rational trier of fact could have found that Lynch created a substantial risk to his child's health or safety by violating a duty of care, protection, or support based on these facts. *Id.* at ¶ 65.

{¶ 74} After a thorough review of the record, we find that this case is more akin to *Cohen* and *Jackson-Williams* than it is to *Kouame* or *Lynch*. While Carpenter and J.C.'s son was in the room when the altercation occurred, he was six- to ten- feet away and was not being held by either Carpenter or J.C. Carpenter and

J.C.'s son was not in immediate danger or involved in the altercation in any way. Although J.C. testified that their child was scared and she told Carpenter that their son was watching, we do not know what the 23-month-old child actually witnessed or thought because of his young age. Thus, we must speculate as to any risk of harm that potentially occurred. Like Cohen, we recognize that witnessing such an incident "could have an emotional impact on a child." However, we cannot say that a substantial risk to the child's health or safety was created based on the limited facts before us and the child's witnessing of the incident alone. *Kouame* at ¶ 119 (S. Gallagher, P.J., concurring in judgment only) ("Simply presuming that the witnessing of an incident can cause such harm is insufficient."). Accordingly, we decline to expand our application of R.C. 2919.22(A) to the facts of this case and find that there is insufficient evidence in the record to uphold Carpenter's endangering-children conviction.

{¶ 75} Accordingly, Carpenter's first assignment of error is sustained as it relates to his endangering-children conviction. Having concluded that there was insufficient evidence to support Carpenter's conviction for endangering children, we find that his second assignment of error — challenging the manifest weight of the evidence — is moot in regard to that conviction. App.R. 12(A)(1)(c).

**B. Alleged Discovery Violations**

{¶ 76} In his third assignment of error, Carpenter claims that the State committed discovery violations under Crim.R. 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).

### 1. *Brady v. Maryland*

{¶ 77} First, we address Carpenter's contention that the State committed a *Brady* violation because it failed to timely disclose a full copy of the cassette-tape recording. Carpenter claims that he was unable to investigate the authenticity and context of the recording or prepare an informed cross-examination since he was not given proper notice.

{¶ 78} In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. A *Brady* violation is established when a defendant shows that "'the favorable [but suppressed] evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (Brackets in original.) *State v. Addison*, 2024-Ohio-5805 at ¶ 21 (8th Dist.), quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

{¶ 79} Relevant to Carpenter's arguments, *Brady* only applies to a complete failure to disclose; it does not apply to a delayed disclosure of exculpatory information unless the delay itself causes prejudice. *State v. Osie*, 2014-Ohio-2966, ¶ 155. And while *Brady* imposes an obligation on the State to turn over evidence that is both favorable to the defendant and material to guilt or punishment, materiality pertains only to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial. *Id*. at ¶ 154.

{¶ 80} Here, the cassette-tape recording was received by the State on the morning of trial and played for the parties prior to the trial's commencement. After listening to the cassette tape, the defense indicated that they did not believe the recording amounted to a "smoking gun" and would not object if the State introduced it. On appeal, Carpenter claims that only a portion of the recording was played, referencing comments that the recording was only two-three minutes instead of six. While our review of the exhibit reveals that Carpenter's "yeah what about it" comment occurred within the recording's first two minutes, it is unclear which portion was played prior to trial based on the record before us.

{¶ 81} Nevertheless, the recording was played in its entirety during J.C.'s direct-examination. The defense did not object. During cross-examination, the defense questioned J.C. about the recording's authenticity and origin. The defense also challenged J.C.'s interpretation of the recording, including Carpenter's statements and their meanings, based on their own characterization of the recorded interaction. While the cassette tape was available to the defense for further inspection from the onset of its disclosure, the State provided the defense with a digital copy of the recording prior to its cross-examination of J.C.'s mother.

{¶ 82} Based on this record, we decline to find that the State completely failed to disclose the cassette-tape recording. Nor do we find that the purported delayed disclosure prejudiced Carpenter or undermined confidence in the verdict. Accordingly, we find that the State's disclosure of the cassette-tape recording did not amount to a *Brady* violation.

## 2. Crim.R. 16

{¶ 83} Next, we turn to Carpenter's claim that the State violated Crim.R. 16. Carpenter asserts that the State's late and incomplete disclosure of the cassette-tape recording materially prejudiced him since the full recording was different in tone and content from the originally disclosed segment. Carpenter claims the authenticity and origin of the recording were "ambiguous at best" and key phrases were unclear. Carpenter concedes that he failed to raise a timely objection to the purported discovery violation during trial and acknowledges that our review is limited to plain error.

{¶ 84} Crim.R. 16 establishes the parameters for discovery and inspection. Relevant to this appeal, Crim.R. 16(B)(1) provides that the State shall provide copies, or permit the defendant's counsel to copy, any recorded statement by the defendant that is material to the preparation of a defense or intended for use by the State as evidence at trial.

{¶ 85} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." As acknowledged by Carpenter, he waived all but plain error and bears the burden of establishing that error on appeal since he did not object to the introduction of the cassette-tape recording. *State v. Allbritain*, 2020-Ohio-2963, ¶ 27 (5th Dist.) ("An appellant waives a Crim.R. 16(B) issue for all but plain error if appellant did not preserve the issue for appellate review."); *State v. Bond*, 2022-Ohio-4150, ¶ 7 ("The main distinction between plain-error review, which is the

standard employed when a defendant failed to object at trial, and harmless-error review, which is employed when a defendant did object, is the party that bears the burden."). Under the plain-error standard, the defendant must show that "'but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.'" *State v. West*, 2022-Ohio-1556, ¶ 22, quoting *State v. Quarterman*, 2014-Ohio-4034, ¶ 16.

{¶ 86} Even if we assume that the alleged discovery violation occurred, Carpenter has not demonstrated how that error impacted his convictions in light of the other evidence against him. Nor has Carpenter established that reversal is necessary to correct a manifest miscarriage of justice. Because Carpenter has not shown that but for the alleged error, the outcome of the proceedings would have been different, we decline to find plain error. Accordingly, Carpenter's third assignment of error is overruled.

{¶ 87} Judgment affirmed in part and reversed in part. We affirm Carpenter's strangulation and domestic-violence convictions but remand the case to the trial court to vacate Carpenter's endangering-children conviction because of a lack of sufficient evidence.

It is ordered that appellant and appellee share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

convictions having been affirmed in part, any bail pending appeal is terminated. Case remanded to the trial court to vacate the child-endangering conviction and for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, PRESIDING JUDGE

DEENA R. CALABRESE, J., CONCURS;
SEAN C. GALLAGHER, J., CONCURS IN PART AND CONCURS IN JUDGMENT ONLY IN PART (WITH SEPARATE OPINION)

SEAN C. GALLAGHER, J., CONCURRING IN PART AND CONCURRING IN JUDGMENT ONLY IN PART:

{¶ 88} I fully concur with the majority's resolution of all issues but the reversal of the child-endangerment conviction. Once again, this case highlights an issue on the application of R.C. 2919.22(A) as to whether a child-endangering conviction can be sustained solely based on a presumption that the defendant created a substantial risk to the mental health or safety of the child based on the child's witnessing the defendant's acts of violence or other deviant behavior against another family member. *State v. Kouame*, 2020-Ohio-3118, ¶ 114 (8th Dist.) (S. Gallagher, J., concurring in judgment only). The parties appear to believe that the trier of fact may simply presume the existence or nonexistence of a substantial risk to the mental health or safety of a child solely based on the child's proximity to the defendant's belligerence. For good reason, *Cleveland Hts. v. Cohen*, 2015-Ohio-

1636, ¶ 30 (8th Dist.), *State v. Jackson-Williams*, 2020-Ohio-1118, ¶ 36 (8th Dist.), *Kouame* at ¶ 45, and *State v. Lynch*, 2025-Ohio-2769, ¶ 64 (8th Dist.), seemingly reinforce that belief.

{¶ 89} The inquiry into the substantial risk to the child's mental health cannot be based on presumptions arising from proximity to, or involvement in, the violence or the severity of the misconduct as the above cases imply. R.C. 2929.22(A) is not based on creating "any" risk, but instead demands there be evidence of a "substantial" risk. When assessing the mental health of a child witnessing familial violence, presumptions are insufficient. There must be evidence substantiating or refuting the claims of substantial risk of mental harm caused by the offender. To be clear, there was no evidence, one way or the other, presented at trial in this case demonstrating the impact on the 23-month-old toddler who was present when the domestic violence was committed against a parent.

{¶ 90} Both Carpenter and the State rely on mere speculation as the basis of their competing arguments as to whether there is sufficient evidence supporting the child-endangerment conviction. Carpenter's argument entirely relies on the supposition that "[t]he child was even less capable of understanding or processing the alleged incident" than the older children in *Cohen* and *Jackson-Williams,* making any risk of substantial harm to the child's mental or emotional health "remote." There is absolutely no evidence presented in this record substantiating that claim. Carpenter would have this panel merely presume that fact of consequence based on the child's age alone.

{¶ 91} The State's argument is no better.  The State solely relies on the fact that the 23-month-old child was "crying, screaming, and clearly terrified" as the basis to demonstrate the threat of substantial mental harm created by Carpenter. Similar to Carpenter's argument, there is no basis to conclude that a child that young is capable of recognizing and then internalizing the violence for the purpose of determining whether there was a substantial risk to the toddler's mental health or safety.  While it is understandable that any form of intrafamilial violence in the proximity of children is cause for concern, the child-endangerment crime requires proof of a substantial risk.  That statute does not create a presumption of the existence of a substantial risk solely based on the child's proximity to or the severity of the violence.

{¶ 92} It may be time to shy away from the analysis based on the child's proximity to the belligerence leading to some form of presumption as discussed in *Cohen,* 2015-Ohio-1636 (8th Dist.), *Jackson-Williams,* 2020-Ohio-1118 (8th Dist.), *Kouame,* 2020-Ohio-3118 (8th Dist.), and *Lynch,* 2025-Ohio-2769 (8th Dist.), for example, and strive for an evidence-based standard, most likely in the form of expert evidence describing the mental health of children witnessing or being involved in domestic violence.  A child's mere proximity to violence should not control the analysis when the issue is related to the mental health of children caused by the incident, especially when the victims are toddlers.  For this reason, I concur in part and concur in judgment only in part with the majority's resolution of the child-endangerment conviction.